## SCHWARTZ *v.* DUSS.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 38. Argued April 22, 23, 1902.—Decided October 27, 1902.

In an action brought for the distribution of the property and assets of the Harmony Society on the ground that it had ceased to exist and that its assets should revert to the heirs of the original contributors some of whom were ancestors of the plaintiffs in error (complainants below),

and that the defendants now in control of the property should be enjoined from transferring the same to a corporation or otherwise dealing with the same, the bill contained allegations of fraud and conspiracy on the part of the defendants. The ancestors of the complainants had long since retired from the society and signed releases. The effect of several agreements between the members and founders of the society was involved in the action; it had been held by the master, whose conclusions of law and fact were approved by the Circuit Court and the judgment thereon affirmed by the Circuit Court of Appeals, that none of the plaintiffs had such a proprietary right or interest in the property and assets of the Harmony Society as entitled them upon the dissolution of the society to any part of, or share therein, as prayed for in the bill, and also that the society had not been dissolved by the common consent of the members or by an abandonment of the purposes for which it was formed.

In affirming this judgment dismissing the bill, it is stated: "The Harmony Society, the history whereof has been recited and its principles characterized and defined by the Supreme Court of Pennsylvania and by this Court " ( *Schriber* v. *Rapp*, 5 Watts, 351; *Baker* v. *Nachtrieb*, 19 How. 126; *Speidel* v. *Henrici*, 120 U. S. 377), was founded by George Rapp, and its members " were associated and combined by the common belief that the government of the patriarchal age, united to the community of property, adopted in the days of the Apostles, would conduce to promote their temporal and eternal happiness."

The relations of the society, precepts of government, personal and property rights, were provided for by several written contracts executed in 1805, and thereafter. By one of these agreements some of the members who contributed property to the society renounced individual ownership, but by the same agreement George Rapp and his associates promised to refund to any members retiring the value of the property so brought in, and if any members who had brought nothing into the community retired, they should, provided they departed openly and orderly, receive a donation of money to be determined by George Rapp and associates.

By a subsequent agreement made in 1836, it was provided that each individual was to be considered as having finally and irrevocably parted with all his former contributions, and on withdrawing should not be entitled to demand an account thereof as a matter of right, but it should be left altogether to the discretion of the superintendent to decide whether any, and if any, what, allowance should be made to such member or his representatives as a donation.

The membership of the society having greatly diminished, many of the members retired leaving only the defendant in this action and a few others, who had determined to transfer the property to a corporation, when complainants filed a bill claiming that the society was dissolved and that the assets were held by the remaining members and officers in trust and should be distributed between former members and their descendants including complainants:

*Held* that the facts did not show that there was any dissolution of the

society; that the relations of the members and the society were fixed by contract; that the plaintiffs could not have other rights than their ancestors had; that no trust was created by the agreement of 1836, and under its terms when the plaintiffs' ancestors (who had not contributed any property) died or withdrew from the society their rights were fixed by the terms of that agreement; the members who died left no rights to their representatives, and had no rights which they could transmit to the plaintiffs.

The Supreme Court of Pennsylvania has decided in other cases involving these contracts that they were not offensive to the public policy of Pennsylvania.

The master, the Circuit Court and the Circuit Court of Appeals, having found that the society had not been dissolved, either by consent of its members or by the abandonment of the purposes for which it was founded, this court will not, on account of such concurrence and under the rules of the court, review the disputed facts involved in that finding.

THIS suit was brought for the distribution of the property and assets of the Harmony Society, which the bill alleged had ceased to exist. The bill also prayed for an injunction against John S. Duss to restrain him from in anywise dealing with the property of the society, and also for a receiver. The bill was exceedingly voluminous. It stated the origin and principles and plan of government of the society; that many industries were started and conducted by it, including a savings bank; the town of Economy, Pennsylvania, founded by it; and that its acquisitions, including 3000 acres of land in the city of Pittsburg, amounted, in 1890, to upwards of $4,000,000; and "all of said possessions up to and until the grievances hereafter complained of, were scrupulously used for the benefit of all its members and for the advancement, benefit and continuation of the society;" that until those grievances the society, "from the period of its inception until a recent date, adhered rigidly to its plan of government and became illustrious and highly respected by reason of its sincere advocacy of the equality of man, its espousal of the highest principles of Christianity, and its honesty and benevolent administration of all public functions, whether in the management of its internal affairs or in its many transactions with the citizens of Western Pennsylvania."

The bill also averred that the society "but once in a period

of ninety years suffered from serious internal disorder," which arose from the induction into the society of one Count De Leon, his artifices and subsequent secession. That in 1890 there " began a second conspiracy, the results of which overturned and destroyed the entire government of the society, wasted nearly its entire wealth, depleted its membership to a few aged and infirm women, and placed the management of the society and the control of its remaining assets in the hands of one man and certain associates and confederates, within and without the ranks of the society."

That the acting and directing mind of the conspiracy was John S. Duss, and he obtained his power as follows: In 1847 a plan of regulation and government of the society was adopted, by which its internal affairs were managed by a " board of elders," composed of nine members, and its external affairs were managed by a " board of trustees," composed of two members. Romulus L. Baker and Jacob Henrici were chosen the first board of trustees. Baker died in 1868, and Henrici and Jonathan Lenz became the board of trustees; the latter was succeeded upon his death in 1890 by Ernest Woelful; Woelful also died in 1890 and Duss became his successor. Henrici died in 1892, and one Samuel Sieber was appointed, and on his retirement from the society Gottlieb Riethmueller, a relative of Duss, was elected trustee. At the time of the filing of the bill Duss and Riethmueller were trustees.

The bill detailed the acts and purposes of Duss at great length. It is, however, enough to say that the bill alleged that he became senior trustee and a member of the board of elders, and conceived the purpose of wrecking and dismembering the society, and attempted to execute such purpose. That the condition of the society gave him opportunity; that he caused the expulsion of at least one member, and induced or paid others to withdraw. That the increase in the society could only be through the admission of new members, and he directed that no new members be elected under any circumstances whatever, and as a result thereof the said Duss and Susie, his wife, were the last members admitted in the four years preceding the filing of the bill.

That he entered into certain arrangements with one Henry Hice and John Reeves, of the town of Beaver, Pennsylvania, by which he used $1,000,000 of the society's money without the knowledge or consent of its members "to pay off the alleged indebtedness of the Economy Savings Bank, of which said Hice and Reeves were the principal officers," though at the time he knew that the bank was wholly insolvent by reason of the overdrafts made by said Hice and Reeves, and although he knew that they had caused a loss to the society of over $2,000,000, " as officers and stockholders in said bank, and officers and stockholders in the Beaver Falls Cutlery Works and File Works, the debtors of said bank;" that he had not sued to recover back the money, but, on the contrary, had abetted them in obtaining further assets of the society.

That in pursuance of his scheme to defraud the society and to pay the indebtedness of the Economy Savings Bank, and for paying off claims upon which the society was only partly liable, if at all, he and his co-trustee Henrici executed a mortgage for the sum of $400,000 upon the real estate of the society, but that Henrici at the time of its execution " was in *articulo mortis*, and wholly beyond any power of comprehension of his act." And on the — day of June, 1893, he caused to be executed another mortgage, without the knowledge or consent of the members, for $100,000, bearing interest at six per cent, upon the land described in the former mortgage, to raise a fund " wherewith to secretly secure and induce removal of those members most likely to inquire into the validity or propriety of his conduct as trustee."

It was averred that the society had certain dividend paying stocks which Duss, in pursuance of his scheme, disposed of without the knowledge of any member of the society, except possibly his wife, and Gottlieb Riethmueller. The names of ten persons were stated, who, it was alleged, Duss, " by representation, coercion and the payment of large sums of money," were induced within two years preceding the commencement of the suit to withdraw from the society, and that he was endeavoring to compel remaining members " to depart by means of intimidation and oppression."

That the membership of the society was reduced to eight persons, none of whom were aware of the actions of Duss, or were consulted by him.

"That on the 12th day of April, 1894, the said Duss, without any authority from the members of the Harmony Society, and in the utmost disregard to his trust, secretly entered into an agreement with said Hice, Reeves and one James Dickson, whereby he, the said Duss, agreed to convey the town of Economy, the surrounding properties and certain other lands of the Harmony Society, situate in Allegheny County, to the Union Company, an alleged corporation created under the laws of the State of Pennsylvania. And your orators allege that a conveyance has been made by said Duss for the lands as aforesaid, and that the same was made without the knowledge of your orators or any members of the said society, excepting possibly Susie C., wife of said Duss, and Gottlieb Riethmueller. That by the said pretended conveyance and sale of the home of the Harmony Society and its other properties, the said Duss has attempted to wholly terminate the existence of said society, not only as to the government thereof by the board of elders and by the members, but also as to the ownership of any property. That the said Union Company, in addition to said Duss and Riethmueller, is composed of said Hice and Reeves, debtors of the said Harmony Society, as hereinbefore stated, and one James Dickson, the private bookkeeper and confidential agent of said Duss, whose interest in said corporation was acquired by gift from said Duss.

"That your orators are advised that it was not competent for the said trustees to convey said properties to the said Union Company, but such transfer was a breach of trust and wholly invalid."

It was further averred that the principle of equality had been departed from. That Duss and his family enjoyed every luxury, while the aged and infirm members were obliged "to be content with the bare necessaries of life, awarded with grudging, stinting hands."

And it was finally averred—

"That recently said Harmony Society has become dissolved

as aforesaid ; that all of its purposes and practices established
as aforesaid by the founder of said society and by the ancestors
of your orators have been abandoned; that the pursuit of
agriculture no longer exists in said society ; that its chief assets,
consisting of bonds, stocks and other securities, and the town
of Economy, with its buildings and the adjacent lands of said
society, consisting of some 3000 acres, and which constituted
the basis of organization and business of said society, have
been sold and conveyed away by the said Duss as aforesaid in
fraud, however, of the rights of your orators and their co-
tenants, and that by reason of the facts hereinbefore set forth
your orators and the said last members, except the said Duss
and wife, are now tenants in common of all said lands and
tenements, and entitled to partition thereof in proportion to
their respective interests.

"That for some time past the members of said Harmony
Society have been retiring therefrom and have received the
amount of their interest in said association in the land or money,
or both, the land being set apart in severalty to them, and have
released all of their rights and interests in said association in
consideration for such payment or conveyance to them, and
that by said retirement and withdrawal the membership of said
association has been reduced to the persons hereinbefore named
members ; that by common consent this association has ceased
to exist as an association, and that if the property thereof has
ever been impressed with a trust (which your orators deny, as
being contrary to public policy and void in law or equity),
such trust has wholly ceased, and the assets of such dissolved
association have reverted to the donors thereof, among whom
were the ancestors and intestates of your orators as hereinbe-
fore fully set forth."

Duss, Hice, Reeves and the Union Company answered sepa-
rately. The other defendants joined in an answer. By agree-
ment of the parties the case was referred to a master, with
"authority to hear and take all the testimony, and to find all
the issues of law and facts, and to report the testimony and
such findings to the court, and if the report of such master
shall suggest a decree that the plaintiffs or any of them are en-

titled to an account against the defendants or any of them, and the same be confirmed by the court, then the case shall be referred again to the master, to state such an account and report thereon to the court."

Under the orders of the court the master considered the following questions :

" First. Have the plaintiffs, or any of them, such a proprietary right or interest in the property and assets of the Harmony Society as entitled them upon the dissolution of the society to any part of or share in such property or assets or as entitles them to the account prayed for in the bill ?

" Second. Has the Harmony Society been dissolved by the common consent of the members or by an abandonment of the purposes for which it was formed ? "

On both propositions the master reported adversely to the claim of the petitioners, and recommended a decree dismissing the bill. His conclusions of fact and law were approved and accepted by the Circuit Court, and a decree entered dismissing the bill. The decree was affirmed by the Circuit Court of Appeals. The case was then brought here by certiorari on petition of the plaintiffs in the Circuit Court. Other facts will be stated in the opinion.

*Mr. George Shiras, 3d,* and *Mr. Shoyer, Jr.,* for petitioners.

*Mr. D. T. Watson* for respondents. *Mr. Johns McCleave* was with him on the brief.

Mr. Justice McKenna, after making the foregoing statement, delivered the opinion of the court.

Two questions were submitted to the master : (1) Have the plaintiffs such a proprietary right or interest as would entitle them upon the dissolution of the society to share all its property or assets, or which entitles them to an accounting ? (2) Has the society been dissolved by consent or by an abandonment of the purposes for which it was formed ? A negative answer to either of the propositions determines the controversy against

petitioners, and both were so answered by the master and by the Circuit Court and the Circuit Court of Appeals. The case, therefore, seems not to be as broad or as complex as presented in the argument of counsel. The case is certainly clear from any disputes of fact, and we may dismiss from consideration the accusations against Duss, not only as to his motives in joining the society, but also as to his motives and acts as a member and officer of it. We are concerned alone with the legal aspect and consequences of his acts and those of his associates. They, however, pertain more particularly to the second proposition.

This is not the first time that the Harmony Society has been before the courts. Its history has been recited and its principles characterized and defined, not only by the Supreme Court of Pennsylvania, but by this court. *Schriber* v. *Rapp*, 5 Watts, 351; *Baker et al.* v. *Nachtrieb*, 19 How. 126; *Speidel* v. *Henrici*, 120 U. S. 377.

The society was formed by one George Rapp, who, with his son and others, came from the Kingdom of Wurtemberg to the United States in 1803 or 1804, and settled at Harmony, in Butler County, Pennsylvania. In 1814 the society moved to Posey County, Indiana, and later removed to Economy, Pennsylvania, its present abode, in 1825. Its members "were associated and combined by the common belief that the government of the patriarchal age, united to the community of property, adopted in the days of the Apostles, would conduce to promote their temporal and eternal happiness." 19 How. 126.

Their relations, principles of government, personal and property rights were provided for by written contracts executed respectively in 1805, 1821, 1827, 1836, 1847, 1890 and 1892. The present discussion is concerned with the first four.

By article 1 of the contract of 1805 each subscriber to that contract delivered up, renounced and remitted all of his or her property of every kind, "as a free gift or donation, for the benefit and use of the community," and bound himself, his heirs and descendants, "to make free renunciation thereof, and to leave the same at the disposal of the superintendents of the community," as if the subscriber "never had nor possessed it."

In article 2 they pledged obedience and submission to the society, and promised " to promote the good and interest of the community," and to that they pledged their children and families. But recognizing a possible weakness and inability to " stand to it in the community," they promised (article 3) never to demand any reward for themselves or children for " labor or services," and declared whatever they should do would be " as a voluntary service for our brethren." In consideration of this renunciation of property and dedication of labor and services, George Rapp and his associates promised to supply the subscribers to the contract with all the necessaries of life, not only in their " healthful days, but when they should become sick or unfit for labor." And if after a " short or long period " a member should die or otherwise depart from the community, " being the father or mother of a family," such family should " not be left widows and orphans but partakers of the same rights and maintenance."

Article 5 was as follows :

" And if the case should happen, as above stated, that one or more of the subscribers, after a short or long period, should break their promise, and could or would not submit to the laws and regulations of the church or community, and for that or any other cause would leave Harmony, George Rapp and his associates promise to refund him or them the value of his or their property, brought in without interest, in one, two or three annual installments, as the sum may be, large or small ; and if one or more of them were poor and brought nothing into the community, they shall, provided they depart openly and orderly, receive a donation of money, according to his or their conduct while a member, or as he or their circumstances and necessities may require, which George Rapp and associates shall determine at his or their departure."

The society became the owner of about 7000 acres of land at Harmony, which on May 6, 1815, was conveyed by Frederick Rapp, as attorney in fact, to Abraham Ziegler for $100,000. That year, or in 1814, the society removed to Indiana. There a second agreement was entered into January 20, 1821. This agreement expressed, as that of 1805, the submission of the sub-

scribers to the society, the dedication of their service and labor, and contained the same promises of support.

The master found that " in 1825 the society removed from Indiana to Beaver County, Pennsylvania, where they purchased and settled upon a tract of land containing about 3000 acres, now known as 'Economy,' where they have since remained, and which has since become very valuable, and on which they have erected many buildings, including dwellings and factories of various kinds, and made many valuable improvements."

In 1827 another agreement was entered into, the preamble of which was as follows:

" Whereas by the favor of Divine Providence an association or community has been formed by George Rapp and many others upon the basis of Christian fellowship, the principles of which being faithfully derived from the sacred Scriptures, include the government of the patriarchal age, united to the community of property adopted in the days of the apostles, and wherein the single object sought is to approximate, so far as human imperfection will allow, to the fulfillment of the will of God by the exercise of those affections and the practice of those virtues which are essential to the happiness of man in time and throughout eternity.

" And whereas it is necessary to the good order and well being of said associations that the condition of membership should be clearly understood, and that the rights and privileges and duties of every individual therein should be so defined as to prevent mistake or disappointment on the one hand and contention or disagreement on the other."

This agreement was an amplification of that of 1805. Article 5 of the latter became article 6. This agreement was signed by 522 members of the association, and afterwards, and until February 14, 1836, was signed by 144 additional members. In 1832, dissensions having arisen, a large number of the members withdrew under the leadership of one Count De Leon. They received $110,000, and granted a release unto George Rapp and his associates of all of their right and title in any of the property " belonging to the society of George Rapp and his associates."

In 1836 another agreement was entered into revoking and annulling the sixth article of the agreement of 1827—fifth article of the agreement of 1805. The agreement recited the sixth article—

" And whereas the provisions of the said sixth article, though assented to at the time, manifestly depart from the great principle of a community of goods and may tend to foster and perpetuate a feeling of inequality at variance with the true spirit and objects of the association; .

" And whereas the principle of restoration of property, besides its pernicious tendency, is one which cannot now be enforced with uniformity and fairness, inasmuch as the members of the association in the year 1816, under a solemn conviction of the truth of what is above recited, did destroy all record and memorial of the respective contributions up to that time; ·

" And whereas continued happiness and prosperity of the association, a more intimate knowledge of each other, have removed from the minds of all members the least apprehension of injustice and bad faith : ·

" Now, therefore, be it known by these presents that the undersigned, with a view to carry out fully the great principles of our union, and in consideration of the benefits to be derived therefrom, do hereby solemnly enter into covenants, and agree with each other as follows :

" 1st. The said sixth article is entirely annulled and made void, as if it had never existed ; all others remain in full force as heretofore. ·

" 2d. All the property of the society, real, personal and mixed, in law or equity, and howsoever contributed or acquired, shall be deemed now and forever joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in land, goods, money or labor ; and the same rule shall apply to all future contributions whatever they may be.

" 3d. Should any individual withdraw from the society, or depart this life, neither he in the one case nor his representatives in the other shall be entitled to demand an account of said

contributions, whether in land, goods, money or labor, or to claim anything from the society as matter of right. But it shall be left altogether to the discretion of the superintendent to decide whether any, and if any what, allowance shall be made to such member or his representatives as a donation."

The agreement was signed by all who were then members, and subsequently by thirty-three others.

Prior to his death, in 1834, Frederick Rapp, a member of the society, had been its business agent, and transacted its external affairs. After his death the members of the society (July 5, 1834) executed a power of attorney to George Rapp, constituting him such general agent, with power to appoint agents and substitutes under him. On the same day he appointed Romulus L. Baker and Jacob Henrici his substitutes. This power of attorney was signed by 402 members, and recited the death of Frederick Rapp, and the consequent necessity for the appointment of a new agent, so that the temporal affairs of the society would continue to be managed in a mode which had proved convenient and satisfactory, constituted George Rapp such agent with power of substitution, invested him with all necessary powers, including the receipt and the execution of conveyances of real and personal property. George Rapp disclaimed any greater interest in the then resources or future earnings of the society than other members.

George Rapp was the founder of the society, and continued to be its head or superintendent, and to rule and govern it until his death in 1847. After his death another agreement was executed (August 12, 1847). It was signed by 280 members. The agreement recited the death of Rapp, and expressed the necessity " to the good order and well being of the association that some plan should be agreed upon to regulate its future affairs, promote its general welfare and preserve and maintain it upon its original basis ; " it also announced to all immediately concerned that the surviving and remaining members of the Harmony Society, each covenanted with all the others thereof, and with those who should thereafter become members, " to solemnly recognize, reëstablish and continue the articles of our

association (the sixth section excepted), entered into at Economy on the 9th day of March, A. D. 1827."

This agreement created a board of elders of nine members to conduct the internal affairs of the society, and a board of trustees of two members to conduct its external affairs. The trustees disclaimed any greater personal interest in the property of the society than other members.

These agreements, the master found, "are the agreements and documents under which, or some of which, the plaintiffs claim the right to share in the property and assets of the society as heirs of former members." And as to the relations of the plaintiffs to the society the master found as follows :

"1st. That none of the plaintiffs were ever members of the society.

"2d. That all of those members of the society through whom Christian Schwartz claims as their heir, signed the agreements of 1836 and 1874, and continued members until their death.

"3d. That Antony Koterba claims as heir of his father, Joseph Koterba, and his half-brother, Andreas Koterba ; that Joseph Koterba joined in the organization of the society, and also signed the agreement of 1827, and afterwards, in 1827, withdrew from the society ; and that Andreas Koterba signed the agreements of 1827, 1836 and 1847, and died a member of the society.

"4th. That the grandparents of David Strohaker, viz., Christian Strohaker and wife, and Matthias Rief and wife, joined the society in 1805, and all remained members until their death— all dying between 1820 and 1825, except Mrs. Rief, who died between 1830 and 1836. That his father, Christopher Strohaker, signed the agreement of 1827, and withdrew from the society in 1827. That his aunt, Catharina Strohaker, signed the agreements of 1827, 1836 and 1847, and continued a member of the society until her death.

"5th. That Lawrence Scheel and Jacob Scheel, ancestors of Allen and G. L. Shale, joined the society in 1805 ; that Lawrence withdrew in 1824 or 1826 ; that Jacob Scheel signed the agreement in 1827 and died a member, about 1837.

" 6th. That none of the parties through whom the plaintiffs claim contributed any money or property to the society."

He divided the persons from whom the plaintiffs claim as follows:

" First. Those withdrawn from the society before the execution of the agreement of 1836.

" Second. Those dying in the society before that time.

" Third. Those who died members of the society after having joined in the agreements of 1836 and 1847."

Manifestly the plaintiffs cannot have other rights than their ancestors, and the rights of the latter depend upon the agreements they signed. The agreements we have recited. The signers of them certainly strove to express their meaning clearly, and, whenever occasion arose, declared their understanding, aims and purposes, and always substantially in the same way.

The cardinal principle of the society was self-abnegation. It was manifested not only by submission to a religious head, but by a community instead of individual ownership of property, and the dedication of their labor to the society. The possibility of some member or members not being able to "stand to it," to use the expressive phrase of the agreements, was contemplated, and provision was made for that event. But a very significant difference was made between a performance of service and the contribution of property. For the former it was covenanted by the members no reward should be demanded for themselves or their children or those belonging to them. As to the latter, George Rapp and his associates promised to refund the value of the property brought in without interest, in one, two or three annual installments, as the same might be large or small. It was, however, provided, as to those who " were poor and brought nothing to the community," that they should receive, if they departed openly and orderly, "a donation in money, according to his or their conduct while a member, or as his or their circumstances might require," as " George Rapp and his associates shall determine " (agreement of 1805); as " in the judgment of the superintendents of the association " (agreement of 1827).

Those provisions apply to those who withdrew from the society prior to 1836—the first class into which the master divided the plaintiffs, and need not much comment. None of the persons who so withdrew contributed property to the association. We are not informed by the record whether their conduct when in the society or whether their manner of withdrawing from it, entitled them to the consideration that the articles of agreement permitted as an indulgence to withdrawing members. If they could have exacted anything as a matter of right it would now be presumed that it had been demanded and the demand satisfied.

There was another class, the faithful and abiding members, but even these, the master found, contributed no property, and the decision of their rights becomes as easy as the decision of the right of those who "could not stand to it in the community" and withdrew. They promised, as we have seen, to endeavor by the labor of their hands "to promote the good and interest of the community," and to hold their "children and families to do the same." And for compensation they received instruction in church and school. They received assurance of maintenance "in healthful days" and days which might not be such, and assurance when death should come to them, that their families would be taken care of. It may be presumed that as the members were faithful to their covenants the society was faithful to its covenants, and there were no undischarged obligations or rights for distant relatives of deceased members to assert or claim against the community or its property. This seems to be conceded by counsel for petitioners, and we are brought to the consideration of the third class into which the master divided the persons from whom some of the petitioners claim to derive, those who died members of the society after having joined in the agreements of 1836 and 1847.

Counsel for petitioners say in their brief: " The article of 1836 is the only material article bearing upon the property rights of the plaintiffs, while the articles of 1805, 1821, 1827 and 1847 are material in considering the character of the trust, the purposes and principles of the society."

In other words, as we understand counsel by the propositions

they have submitted and the arguments employed to support them, by the articles executed prior to October 31, 1836, those who joined the society made " a free gift and donation of all their property " to George Rapp and his associates, *"for the use and benefit of the community,"* upon the condition, however, to have the property returned to them if they should withdraw from the society. But that " by the articles of October 31, 1836, all the members of the society agreed with each other to surrender this right of property restitution which each possessed, and to convey the same to all the members in equal shares." In other words, the gifts before 1836 were to the community; after 1836 to " all the members in equal shares." This difference in result in 1836 and afterwards was effected, it is claimed, by the following provision of the agreement of 1836 :

" All the property of the society, real, personal and mixed, in law or equity and howsoever constituted or acquired, shall be deemed, now and forever, joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in lands, goods, money or labor, and the same rule shall apply to all future contributions, whatever they may be."

To the articles of 1836, it is also contended, that the society as such was not a party, but nevertheless the property became impressed with a trust for the use of the society, as such, " by those who then (1836) represented the ownership of this joint and indivisible stock," and as each new member came in " he became an owner of an equal share of the property, subject to the trust." And it is further contended that the members of 1836 and those who came in afterwards became *donors* of the property, and when the society or the trust failed from any cause the " corpus of the trust property " reverted to them " by way of resulting trust, . . . not to the surviving members as donees, or beneficiaries of the trust." In other words, the members became at once *donees* of each other and *donors* to the society, and the descendants of members who had not and might not bring a dollar to the society excluded from any interest in the reversion of its great properties the descendants of those

from whom those properties came. And this through the doctrine of resulting trusts, whose fundamental principle is to recognize an equity only in them from whom the consideration has proceeded. And this, too, would result from granting the contentions of petitioners—a society whose chief purpose was to establish community of property would come back to the assertion and fact of individual ownership, and whose hope was self-sacrifice and self-abasement would encourage self-interest and self-assertion. Members could go into the society or go out of it, take nothing to it, serve it ever so little, and become ultimate sharers of its property. They might die in the society, or, having withdrawn, die out of it, and will or convey their titles or rights to others. No such right was ever conceived to exist and no such right was intended to be created. This is demonstrated by the quotations which we have made from the articles of agreement. The permanence of the community was provided for in the articles of 1805; it was continued in those of 1821 and 1827; and on account of the secession of Count De Leon and his followers it was asserted with emphasis in 1836. The article of that year became, and was intended to become, the complete and final consummation of community ownership —did not become and was not intended to become the commencement of individual ownership. That article was but an incident in the life and evolution of the society. It asserted constancy to the principles of the association, and annulled the sixth article of 1825—fifth article of 1805, because that article manifestly departed "from the great principle of community of goods," and it was said that "with a view to carry out the great principles" of their union "and in consideration of the benefits to be derived therefrom," they entered into this covenant:

"Should any individual withdraw from the society, or depart this life, neither he in the one case nor his representatives in the other shall be entitled to demand an account of said contributions, whether in land, goods, money or labor, or to claim anything from the society as matter of right. But it shall be left altogether to the discretion of the superintendent to decide

whether any, and if any what, allowance shall be made to such member or his representatives as a donation."

The purpose was definite and clearly expressed. It was certainly thought to be clear enough by the men who framed it to declare and accomplish the "sacrifice of all narrow and selfish feelings to the true purposes of the association," as the articles fervidly declared. And it was provided that the member who withdrew from the society could make no demand against it "as a matter of right." The member who died left no right to his representatives. It needs no argument to show that as such members had no rights they could transmit none to the petitioners in this case.

No trust having been created by the agreement of 1836 different from that created by the other agreements, there is no necessity to consider the arguments based on the assumption of its invalidity. That agreement was the affirmation and the continuation of the prior agreements, and they were held not to be offensive to the public policy of Pennsylvania, by the Supreme Court of that State in *Schriber* v. *Rapp*, 5 Watts, 351. The trial court in that case had instructed the jury that "there is nothing in the articles of association (those of 1805, 1821 and 1827) given in evidence that renders the agreement unlawful or void; nothing in them inconsistent with constitutional rights, moral precepts, or public policy."

The Supreme Court observed that the point made against the articles as being against public policy was attended with no difficulty, and Chief Justice Gibson said for the court: "An association for the purposes expressed is prohibited neither by statute nor the common law." And it did not occur to this court in *Baker et al.* v. *Nachtrieb*, 19 How. 126, to treat them as invalid contracts. See also *Goesele* v. *Bimeler et al.*, 14 How. 589; *Speidel* v. *Henrici*, 120 U. S. 377.

An analysis of the agreements of 1847, 1890 and 1892 is not necessary. They were made to meet particular exigencies, and expressly affirmed the prior agreements, except the sixth section of that of 1827.

The master, and both the Circuit Court and the Circuit Court of Appeals, found that the society had not been dissolved, either

by the consent of its members or by the abandonment of the purposes for which it was founded. On account of this concurrence the disputed facts involved in that finding, under the rules of this court, and the circumstances of the record, we do not feel disposed to review. There is left, therefore, for consideration only the agreements of 1890 and 1892 and the changes in administration effected by them, and the conveyance of the property of the society to the Union Company. So far as those agreements affect the property rights of petitioners we have expressed an opinion of them, but their effect upon the question of the dissolution of the society, or the effect of the conveyance to the Union Company, we are not called upon to decide. In that question, we have seen, the petitioners have no concern.

*Judgment affirmed.*

MR. JUSTICE GRAY and MR. JUSTICE SHIRAS took no part in the decision.

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUSTICE BREWER, dissenting.

Assuming the validity of the trusts, the questions appear to be, whether the condition of things has resulted in failure to carry out, and of ability to carry out the principles and purposes of the society, and the defeat of the trusts; and, if so, whether the destination of the corpus of the trust property has, thereupon, become such that complainants or some of them have a *locus standi* to ask relief in a court of equity.

The courts below held that the society still existed in law and in fact, and that this case was not one of "dealing with the assets of a defunct or dissolved association;" or in other words, that the trusts had not been defeated; and the decrees rested on this conclusion. If erroneous, the inquiry then arises, to whom does the corpus of the trust property go in the event of the defeat of the trusts.

A brief recapitulation of the facts is necessary to indicate the grounds of my inability to concur in the opinion and judgment of the court.

In 1803, George Rapp and others located at Harmony, Butler County, Pennsylvania, removed in 1814 to Indiana, and returned in 1825 to Pennsylvania, and located at Economy, in Beaver County. They formed a society or association, which, as said by the Circuit Court of Appeals, " was organized upon the principle of community of goods and land ownership.

" The members of the said society who had brought with them from Wurtemburg, money, combined their funds and all their property in common, they lived as members of a common household and each member enjoying, alike with every other, the fruits of their common labor in equality and brotherhood. The occupation or business of the said society was agriculture, except in so far as it was necessary to manufacture shoes, clothing and other necessaries for the community. The members of the said society obeyed George Rapp as their spiritual and temporal leader and ruler. About the year 1807, the community promulgated the doctrine of celibacy as being necessary for the success of a communistic society."

Although styled " George Rapp and his associates," Rapp was, from the beginning to his death in 1847, the absolute and exclusive ruler in whom all power was vested. Members were admitted by adoption and on adoption conveyed and transferred all their property, real and personal, to " George Rapp and his associates," and after 1836, to the Harmony Society, for the use and benefit of the community.

By article 5 of a written agreement of February 5, 1805, if for any cause one or more of the subscribers should leave Harmony, " George Rapp and his associates " promised to refund the value of his or their property brought in, while those who brought nothing in might receive a donation.

The second agreement was dated January 20, 1821, and the third, March 9, 1827.

The first branch of the preamble of this agreement of 1827, read: " Whereas, By the favor of Divine Providence, an association, or community, has been formed by George Rapp and many others, upon the basis of Christian Fellowship, the principles of which being faithfully derived from the sacred Scriptures, include the government of the patriarchal age, united to

the community of property adopted in the days of the Apostles, and wherein the single object sought is to approximate, so far as human imperfection may allow, to the fulfillment of the will of God, by the exercise of those affections, and the practice of those virtues which are essential to the happiness of man in time and throughout eternity."

By the first article the subscribers gave, granted and forever conveyed " to the said George Rapp and his associates, their heirs and assigns, all our property, real, personal and mixed, whether it be lands and tenements, goods and chattels, money or debts due to us, jointly or severally, in possession or in remainder or in reversion, or in expectancy, whatsoever or wheresoever, without evasion, or qualification, or reserve, as a free gift or donation, for the benefit and use of said association or community."

Members were to be obedient to superintendents, were bound to promote the interests and welfare of the community, and were to receive support and instruction.

The sixth article (almost identical with article 5 of 1805), was as follows: " And if it should happen as above mentioned, that any of the undersigned should violate his or her agreement, and would or could not submit to the laws and regulations of the church or community, and for that or any other reason, should withdraw from the association, then the said George Rapp and his associates agree to refund to him or them the value of all such property, without interest, as he or they may have brought into the community in compliance with the first article of this agreement, and the said value to be refunded in one, two or three annual installments, as the said George Rapp and his associates shall determine. And if the person or persons so withdrawing themselves were poor, and brought nothing into the community, yet if they depart openly and regularly, they shall receive a donation in money, according to the length of their stay and to their conduct, and to such an amount as their necessities may require, in the judgment of the superintendents of the association."

The master found, among other things, as follows:

"Prior to his death in 1834, Frederick Rapp, a member of

the society, had been the business agent of the society, transacting its external business. After his death the members of the society on July 5, 1834, executed a power of attorney to George Rapp—Exhibit No. 85 in evidence—constituting him general agent of the society in all its temporal affairs, with power to appoint agents and substitutes under him. Under this power, he on the same day appointed Romulus L. Baker and Jacob Henrici his substitutes. This power of attorney was signed by four hundred and two members of the association, and with the substitution and not including the signatures, is as follows:

"'Know all men by these presents: Whereas, Frederick Rapp, of Economy, in Beaver County, State of Pennsylvania, recently deceased, was for a series of years the agent in temporal affairs of the Harmonie Society, carrying on in his own name all the external business of said society and taking to himself the titles to real estate as well as the evidence of claims arising out of the various transactions of said society;

"'And Whereas, By an instrument dated the 20th of July, 1825, under the hand and seal of said Frederick, he solemnly and irrevocably declared that all the property, real, personal and mixed, which then was or hereafter might be in his possession or enjoyment, or the title to which he then held or might hereafter hold, was and should be considered the property of the said society, in which he the said Frederick had no absolute interest whatsoever;

"'And Whereas, The lamented death of the said Frederick Rapp renders it indispensable that a new agent should be appointed by whom the temporal affairs of the society may continue to be managed in a mode which has proved convenient and satisfactory;

"'Now, Therefore, Be it known, that we the undersigned, constituting said Harmonie Society, do hereby nominate and appoint George Rapp, of Economy, in the County of Beaver, the general agent of said society in all its temporal affairs.

"'The powers intended to be conferred on the said George Rapp are hereby declared to be as follows, that is to say:

"'1. To ask for, demand and receive from each and every

bank or other incorporated company, partnership, or individual person or persons, the amount which may be due therefrom, in the way of principal, interest or dividend to the said Harmonie Society, or to Frederick Rapp, whether the same be evidenced by judgment, mortgage, bond, certificate of stock, note, bill of exchange, deposit of money, book account, verbal promise, sale or barter, loan or money, or arise in any other manner whatsoever, the check, order, receipt, acquittance or release of the said George Rapp to be as effectual as if executed by all and each of us, or as if it had been executed by the said Frederick Rapp in his lifetime.

"'2. To execute and receive all deeds and conveyances, in fee simple or otherwise, on behalf of the society, whether the title thereto stand in the name of the society or of Frederick Rapp or of George Rapp and associates. The act of the said George Rapp relative thereto to be as valid and sufficient as if executed by us or by the said Frederick Rapp in his lifetime.

"'3. To carry on, by himself or through the agents whom he is hereinafter authorized to appoint, all the dealings and traffic of said society of every description.

"'4. To constitute and appoint an agent or agents under him as he may deem advisable, imparting to such substitute or substitutes, should he think fit the whole or any portion of the authority hereby conferred on himself. He may also at his pleasure revoke such instrument of substitution whenever he may think such revocation called for by the interests of the society.

"'5. It is distinctly understood that in accepting and acting under this power the said George Rapp disclaims all personal interest other than that of a member of said society in the present resources or future earnings of the society, in conformity with the principles and terms upon which the Harmonie Society was orginally founded, as fully and effectually as was done by the late Frederick Rapp in the instrument already adverted to, dated 20th July, 1825, the terms of which instrument the said George Rapp hereby adopts for himself and repeats in every particular.

"'In witness whereof the undersigned members of the Har-

monie Society who constitute said society, have hereunto set their hands and seals at Economy, in Beaver County, this fifth day of July, in the year of our Lord, eighteen hundred and thirty-four.'

                                        (Signatures.)

(Acknowledgment.)

" ' By virtue of the authority expressed in the fourth article of the foregoing power of attorney, I do appoint and substitute in my place and stead, Romulus L. Baker and Jacob Henrici, of Economy, Beaver County, Pennsylvania, to act as general agents of the Harmonie Society aforesaid, jointly or severally in my name, and for the use of the said society, to do and perform all acts and things which as the general agent of said society, I am authorized to do. It being distinctly understood, however, that in accepting and performing the office and business of general agents of the said society, the said R. L. Baker and Jacob Henrici shall neither acquire nor claim any personal interest in the present resources or future earnings of the said society other than that of a member of the said society, agreeably to the plans and terms of association, but shall be considered as exercising the same trust mentioned in a declaration of trust signed by Frederick Rapp on the 20th day of July, 1825, and referred to in the foregoing power of attorney to George Rapp.' "

Signed, sealed and delivered by George Rapp.

October 31, 1836, the following agreement was executed by 391 members of the society and afterwards accepted and adopted by 33 others:

"Whereas, The Harmonie Society, consisting of George Rapp and many others, now established in the town of Economy, in Beaver County, Pennsylvania, did on the 9th of March, 1827, enter into certain articles of association, of which the 6th in number is as follows, viz. [here follows that article]:

"And whereas, The provisions of the said 6th article, though assented to at the time, manifestly depart from the great principle of a community of goods and may tend to foster and perpetuate a feeling of inequality at variance with the true spirit and objects of the association;

" And whereas, The principle of restoration of property, besides its pernicious tendency, is one which cannot now be enforced with uniformity and fairness, inasmuch as the members of the association in the year 1816, under a solemn conviction of the truth of what is above recited, did destroy all record and memorial of the respective contributions up to that time;

" And whereas, Continued happiness and prosperity of the association, and a more intimate knowledge of each other, have removed from the minds of all members the least apprehension of injustice and bad faith;

" Now therefore, Be it known by these presents that the undersigned, with a view to carry out fully the great principles of our union, and in consideration of the benefits to be derived therefrom, do hereby solemnly enter into covenants, and agree with each other as follows:

" 1st. The said 6th article is entirely annulled and made void, as if it had never existed; all others remain in full force as heretofore.

" 2d. All the property of the society, real, personal and mixed, in law or equity, and howsoever contributed or acquired shall be deemed now and forever joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in land, goods, money or labor; and the same rule shall apply to all future contributions whatever they may be.

" 3d. Should any individual withdraw from the society, or depart this life, neither he in the one case nor his representatives in the other, shall be entitled to demand an account of said contributions, whether in land, goods, money or labor, or to claim anything from the society as a matter of right. But it shall be left altogether to the discretion of the superintendent to decide whether any, and if any, what allowance shall be made to such member or his representatives as a donation.

" Invoking the blessing of God on this sacrifice of all narrow and selfish feelings to the true purposes of the association and to the advancement of our own permanent prosperity and happiness, we have signed the foregoing instrument, and affixed

thereunto our respective seals, at Economy, this 31st day of October, 1836."

George Rapp, sole patriarch and ruler, died in 1847, and thereupon, in that year certain articles were subscribed by two hundred and eighty-eight persons as the "surviving and remaining members of the Harmonie Society, and constituting the same." These articles created and nominated a Board of Elders of nine members, with the power of filling vacancies, and a Board of Trustees, consisting of two members of the Board of Elders, which had power to fill vacancies in the trusteeship. Instead of a single patriarch, a dual patriarchy was substituted, and those boards alone had the power over and control of the property.

The eighth article was as follows:

"It is hereby distinctly and absolutely declared and provided that all the property, real, personal and mixed, which now or hereafter shall be held or acquired by any trustee or trustees, or person under them, is and shall be deemed the common property of said society, and each trustee now or hereafter appointed hereby disclaims all personal interest in the present resources and future earnings of the society, other than that of a member thereof, according to the articles of association hereby established and continued, and according to the present government."

From these documents it appears that prior to October 31, 1836, all contributions of property were for the use and benefit of the community on the condition that any member withdrawing was to receive back the value of his contributions.

But that by the contract of 1836, the property then held in trust was no longer held subject to reclamation on the basis of original contribution, but the whole aggregate was made a common fund in which each member was equally interested, subject to the previously existing trust for the use and benefit of the society; that the corpus of the trust property included all future contributions, accretions and accumulations; and that the then and subsequently admitted members occupied the relation of donors and the society, as a society, of donee.

The joint and indivisible stock embraced all present and fu-

CHIEF JUSTICE FULLER and JUSTICE BREWER, dissenting.

ture property subject to the trusts declared in the articles of 1827, which were reaffirmed in 1836, except the sixth article. That trust was described " as a free gift or donation for the benefit and use of the said association." And by the agreement of 1847, the property was to be held and deemed the common property of said society, and each trustee disclaimed all personal interest therein " other than that of a member thereof."

If then the trusts are defeated I concur in the view that the trust property must go either to the owners or donors living, and to the heirs and legal representatives of those who are dead, by way of resulting trust; or to the surviving members of the society as joint tenants with right of survivorship, or by way of tontine.

It is true that the third clause of the agreement of 1836, provided that on withdrawal, or death, no member, or his representatives, should be entitled to an account or " to claim anything from the society as matter of right." But that clause referred to the society as a going concern, and this bill is not filed against the society, but proceeds on the ground of the termination of the trusts and the existence of a condition of things demanding the winding up of the society's affairs.

And if the system of patriarchal government has been abandoned; if for the communistic scheme, a capitalistic scheme has been substituted; if the society has become a trading community and lost all its distinctive attributes; if it is undergoing the process of liquidation; if all its property and assets have passed to a trading corporation and the power of carrying out its original principles has departed; if its membership has become practically incapable of perpetuation; it follows that the trusts have been defeated and the society ended to all intents and purposes.

Early in 1890, John S. Duss and two others, employés but not members of the society were elected to fill vacancies in the Board of Elders.

In April, 1890, certain articles were executed, the number of members being stated to be 45.

The Junior Trustee having died, John S. Duss was elected to fill the vacancy, and soon after, with his wife and children,

CHIEF JUSTICE FULLER and JUSTICE BREWER, dissenting.

took possession of the official residence of the society. In 1892 the Senior Trustee died, and Duss was elected to that position, one Sieber, the town constable, who had a wife, being elected Junior Trustee. Later in that year other articles were entered into, describing the then number of members as 37.

In February, 1893, certain members of the society filed a bill for its dissolution, the winding up of its affairs and the distribution of its assets.

While the bill was pending, seventeen members received from the assets money and property to the amount of something over one hundred thousand dollars, and gave quitclaims and acknowledgments of full satisfaction of their interest or share in the property of the society. The grantors in nearly all of these instruments acknowledged in consideration of the money paid or land conveyed, that he or she does "hereby release, cancel and discharge any and all claims whatsoever, which I, my heirs, assigns or lawful representatives, may or could ever have against said society or its trustees, its property or assets, or any part thereof, I hereby declaring all such claims to be fully compensated, settled, released and discharged;" and, after reciting the various properties and assets, "I am entirely satisfied to accept as my full share and interest therein," etc.

Two of the deeds contained this paragraph: "While it may be that said society may have and be the possessor of several hundred thousand dollars worth of property after paying all debts, I am entirely satisfied to accept as my full share therein the sum of —— thousand dollars."

After these settlements began the bill was dismissed by consent.

In January, 1894, a corporation styled the Union Company was organized, under the state statute, "for the purpose of the purchase and sale of real estate, or for holding, leasing and selling real estate," its business "to be transacted in the borough of Beaver, county of Beaver, State of Pennsylvania."

On April 11, 1894, seventeen persons purporting to be all the then members of the society, executed a paper stating: "We the members of said Harmonie Society, do each hereby

express our consent with and request that John S. Duss and Gottlieb Riethmueller, the present trustees of said society, shall forthwith sell, transfer and convey to the Union Company, a corporation duly created and organized under the laws of the State of Pennsylvania, all the lands, tenements and hereditaments situated in the Allegheny and Beaver Counties, Pennsylvania, now owned and held by said trustees for the benefit of the said society, to the end that all said lands, tenements and hereditaments may be owned, held and managed by said incorporated company, and be sold and otherwise disposed of from time to time in pursuance of proper corporate action as may be determined by the directors and officers of said incorporated company.

" The capital stock of said incorporated company, however, to be owned and held by the said trustees for the benefit of the society, in accordance with, and on the terms and conditions of the articles of association of said society and the ratifications and modifications thereof, as the same now exists, to the extent of three hundred and ninety-seven thousand five hundred ($397,500) dollars, out of a total capital of four hundred thousand ($400,000) dollars."

The vast property of the society was conveyed to the Union Company, and the stock of that corporation assigned to the trustees.

Since April 11, 1894, nine of the seventeen subscribers have died, leaving eight, consisting of John S. Duss and his wife, one Gillman, 77 years of age, and unable to read or speak English; and five women of the ages of 80, 77, 58, 54, and 47, respectively.

Duss and Gillman became the sole remaining male members of the society and the women, with the exception of Mrs. Duss, were mostly old, infirm or ignorant.

No new member has been admitted since 1893. It is suggested that this was because none desired admission. This may be so, and this would explain the diminishing of over five hundred members in 1827 to two hundred and eighty-eight in 1847, and forty-five in 1890. But the result is the same. The eight remaining cannot reasonably be held to represent the great

CHIEF JUSTICE FULLER and JUSTICE BREWER, dissenting.

communistic scheme which the Wurtembergers of 1803 sought to found on "the basis of Christian Fellowship, the principles of which being faithfully derived from the sacred Scriptures include the government of the patriarchal age, united to the community of property adopted in the days of the Apostles, and wherein the single object sought is to approximate, so far as human imperfection may allow, to the fulfillment of the will of God, by the exercise of those affections, and the practice of those virtues which are essential to the happiness of man in time and throughout eternity."

As the membership diminished the wealth increased, but not from contributions by new members, and operations were carried on by hired labor.

Not one of the eight contributed to the three or four millions of property accumulated. It is conceded that Duss alone is the active member. But he is not the society, nor does the society in respect of its avowed principles any longer exist.

Moreover the transactions by which seventeen members of the society, not old and infirm, but vigorous and capable, were bought out, were in themselves acts of liquidation. It is idle to say that these payments were "donations" to withdrawing members. They were purchases, in terms, and in effect. They were settlements by agreement instead of through litigation.

Finally, substantially the entire property of the society and its affairs have been turned over to a corporation created under the laws of Pennsylvania, authorized to purchase and sell land. This corporation has none of the powers confided by the articles of 1847, to the Board of Elders and the Board of Trustees. It has no power to feed, lodge, maintain and support, or to care for the spiritual welfare of members of the society. or to perform any of the duties imposed upon the boards. The trustees have no distinct title to the society's property, but only the rights pertaining to the stock of the Union Company. All the industries carried on in Economy are carried on by tenants and lessees of the Union Company, and the society has ceased to possess the power to carry out the purposes for which its property was accumulated.

The affairs of the Union Company must be wound up under

the state statutes in that behalf, and proceeds derived from the lands by sale or otherwise would go to the stockholders by way of dividends. The legal effect of the transaction was the same as a sale, out and out, for cash, and it was irrevocable. And this point so arises on the record that it must be disposed of as matter of law.

The master found, as matter of law, that the society continued to exist because the surviving members had not formally declared it to be dissolved, and that the purposes and principles of the society could not be held to have been abandoned unless by the formal action of all its members. But this could only be so on the assumption that the scheme of the trust created a joint tenancy with the right of survivorship, or a system of tontine; and that a single surviving member might be the society although to the integrity of a community, numbers are essential. By the articles neither the members, nor the Board of Elders, nor the Board of Trustees, nor all together, possessed the power voluntarily to formally dissolve the association, and it is for a court of equity to adjudge whether a condition of dissolution or a condition requiring winding up is or is not created by acts done or permitted.

Such being, in my opinion, the condition here, the trust property must go, as I have said, either to the surviving members as joint tenants with right of survivorship, or by way of tontine; or to the owners or donors living, and to the heirs and legal representatives of those who are dead by way of resulting trust.

Appellees contend for the first of these propositions. Their counsel says in his brief: "It is the society, as a society, which owns this property. It is the entire body as one whole. If at any time the society did dissolve, its property would go to the persons who then were its members. No one else has any legal or equitable claim to it except those members. To them, and to them alone, it would belong, and among them it would be divided."

It is inconceivable that the creators of the trust contemplated any such result, when they sought to perpetuate Christian fellowship by the renunciation of their property.

CHIEF JUSTICE FULLER and JUSTICE BREWER, dissenting.

The present membership has shrunk to eight members, less than enough to fill the Board of Elders, and that board consists of Duss and his wife; an old man and five women, aged or ignorant. Practically Duss is the last survivor and he claims the ownership of this vast estate as such survivor. By the articles no period was fixed for the termination of the life of the society. There is no remainder over, nor provision of any kind for the disposition of the trust estate in the event of the society's extinction.

Joint tenancy with survivorship or tontine excluding all but living members and casting accumulations on the survivor, are neither of them to be presumed. They are the result of express agreement and there is none such in these documents.

On the contrary, this property was held in trust for the use and benefit of the society as a society, and not for the individual members. The trust was for the use and benefit of the society in the maintenance of its principles as declared by its constitution and laws. When the purposes of the society were abandoned, or could not be accomplished, or the society ceased to exist, the trust failed, and the property reverted by way of resulting trust to the owners, who subjected it to the trust, living, and to the heirs and legal representatives of those of them who are dead.

This conclusion does not involve the assertion of a reversion secured by the express terms of the contracts, but rests on the familiar principle of equity jurisprudence that when the trust clearly created by the documents terminated a resulting trust arose to the grantors or donors or their heirs. The distinction is thoroughly elucidated by Mr. Justice Gray in *Hopkins* v. *Grimshaw*, 165 U. S. 342. It was there said, among other things:

"But the trust was restricted, in plain and unequivocal terms, to the particular society to be benefited, as well as to the purpose of a burial ground, adding (as if to put the matter beyond doubt) 'and for no other purpose whatever.' The trust would end, therefore, at the latest, when the land ceased to be used as a burial ground and the society was dissolved. . . .

"In the case at bar, the trust created by the deed having

been terminated, according to its express provisions, by the land ceasing to be used as a burial ground, and the dissolution and extinction of the society for whose benefit the grant was made, there arises, by a familiar principle of equity jurisprudence, a resulting trust to the grantor and his heirs, whether his conveyance was by way of gift, or for valuable consideration."

The titles held by the trustees in this case were held for the benefit and use of the society in the maintenance of its principles. When the purposes of the trusts failed the property reverted, not because of special provision to that effect, but because that was the result of the termination of the trusts.

Complainants, or some of them, are the heirs and next of kin of members who signed the articles of 1836 and 1847, and who died in fellowship. The service of one of these families is said to aggregate three hundred years of unrequited toil. They are entitled to invoke the aid of the court in the winding up of this concern, and these decrees ought to be reversed.

I am authorized to state that MR. JUSTICE BREWER concurs in this dissent.