BALTIMORE HUMANE IMPARTIAL SOCIETY AND AGED WOMEN'S AND AGED MEN'S HOMES *vs.* ELISHA PIERCE ET AL.

*Invalidity of Contract by Inmate of Charitable Institution to Assign to it All Future Acquired Property.*

A contract by which a man, upon being received into a home for aged men, agrees to assign to the corporation all the property which he then has and also all that he may thereafter acquire in any manner, is invalid as to future acquired property, because against public policy.

Appeal from the Superior Court of Baltimore City.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.)

*Leigh Bonsal* (with whom was *Edgar G. Miller, Jr.*, on the brief), for the appellant.

In the present case we have nothing to do with specific performance, nor with the liens on subsequently acquired property. We are simply seeking damages for the breach of a clearly expressed and fully understood contract. Unless this Court now determines that this contract is void as against public policy, it would seem that the decision in both cases must be in favor of the appellant. We especially call the Court's attention to the following statement of facts as they now exist, differing as they do from the facts presented in the former appeal. "That although, as stated, through a mistake, Elisha Pierce did not sign his name to the second paragraph of the contract, he had already verbally agreed that if admitted into the Aged Men's Home he would transfer to the Home any property which he might become the owner of by devise, legacy, or otherwise, and the said George W. Pierce and Hamilton M. Brewer also verbally made the same agreement."

Thus a complete verbal agreement is set forth in the declaration embracing all that was contained in the second paragraph of the written contract which, through a mistake, was not signed by Elisha Pierce.

The contract as to the property owned at the time of admission was upheld in all respects by this Court in *Aged Peoples ;Home* v. *Hammerbacker*, 64 Md. 595. Why should a contract as to property owned at the time of making it be valid, and a contract as to property thereafter acquired be held invalid?

The boards of such homes know that often the relatives of old people wish to be relieved of the care and trouble of providing for them, and yet seek frequently and very ingeniously

to get the money of the old people.   The admission contract is an effort to make clear to the applicants for admission and their friends the fact that the Homes are in need of money for the carrying on of their noble work, and the possibility of the applicant through some chance of fortune becoming a benefactor of the Home is clearly presented.   In such an event has not the Home a greater and more just claim upon the money unexpectedly obtained than relatives or friends who have not furnished a home to the old person when in need ? The spectacle of an aged person, unexpectedly acquiring property, continuing to live the few remaining years of his life in contentment at the Home, and making over the property to the Home (not to be squandered, but to be kept in trust permanently for the support of aged people), is surely a much more edifying spectacle to the public than the sight of an old man leaving an institution, in most cases, without the knowledge of how to take care of himself or his money, and often pulled hither and thither by relatives and friends now keen after the old man's money.

In *Bolman* v. *Overall, Exec.*, 2 Southern Reporter, 624 (Alabama), an agreement was held valid and not against public policy, in which testatrix agreed that all property owned by her at her death should go to those taking care of her.   It is apparent that testatrix might have acquired property after agreeing to make her will and before her death, which would have passed to those caring for, along with property owned when agreement was made.   A contract was upheld in Pennsylvania in which a number of brothers and sisters agreed that their interest in their father's land should go to a certain brother, who agreed to take care of the father.   In this case, unexpectedly, coal was found on the land, which rendered it very much more valuable than when the contract was made. *Walker* v. *Walker*, 67 Pa. St. 185.   So a covenant by an heir to convey the estate which shall come to him by descent is valid, if made with the ancestor's consent and for a sufficient consideration, and without advantage being taken of the covenantor.   *Fitch* v. *Fitch*, 25 Mass. 480; *Lewis* v. *Madison*, 1 Munf. 303.

· *Joseph C. France* and *Harry M. Benzinger* (with whom was *Jas. S. Calwell* on the brief), for the appellees.

BOYD, J., delivered the opinion of the Court.

The appellant sued Elisha Pierce and also Casper W. Erek, administrator of George W. Pierce, who was a surety on the contract sued on. Demurrers to both declarations were sustained by the Court below and judgment entered for the respective defendants. From those judgments appeals were taken and, as the two cases involve for the most part the same questions, they were argued together in this Court.

Elisha Pierce was an inmate of the Aged Men's Home belonging to the appellant, and whilst there his son, George W. Pierce, died intestate without leaving any descendants or a widow. Under the statute of this State, Elisha, as the father of the intestate, is entitled to the surplus of the personal property, after the payment of all debts and expenses, which amounts to $3,502.74, according to the allegations in the declarations. The suits are for breach of contract for not turning over said sum to the appellant—the latter claiming that Elisha for himself and George W. as one of his sureties agreed, as part of the consideration for admitting the former into the institution, to transfer to the corporation all property which Elisha thereafter received. The contract sued on is the same that was before us in the case of this Appellant v. Pierce *et al.*, reported in 99 Md. 352, and is in two separate parts. By the rules the applicant for admission into the Home and two responsible persons on his behalf are required to sign the first part, in which they covenant that the applicant will obey the rules, etc., of the corporation, and that they will remove him for certain causes therein set forth. That was signed and sealed by Elisha Pierce, the applicant, and George W. Pierce and H. M. Brewer, the sureties. The other part of the contract was not signed by Elisha Pierce, but was signed and sealed by George W. Pierce and H. M. Brewer. The first paragraph of that is as follows: "We, the undersigned, hereby covenant and declare that Elisha (X) Pierce about to be admitted into the Aged Men's

Home of the above-named corporation hath not now any property, and is not the recipient of any income from any source whatever, and so also covenant that should he, by any devise, legacy or otherwise, become the owner of any property whatever, we will have the same with any now owned, conveyed and transferred to the said corporation, in obedience to this covenant; and by this instrument he grants to said corporation, above named, all his right and title to any and all property of which he is now seized and possessed or to which he hath any right or title."

It will be observed that this paragraph is very peculiarly expressed, and when we examine the rest of the instrument we find it is even more so. There is nothing in it indicating that the applicant had agreed to transfer all property he might afterwards acquire to the appellant, excepting what is contained in the covenant. It might well be questioned whether that language could apply to the applicant at all, or whether it is not intended merely as a covenant of the sureties—"should * * * become the owner of any property whatever, we will have the same, with any now owned, conveyed and transferred"—but it is certain that as the contract was executed it does not apply to him. It reads, "We, the undersigned, hereby covenant," and only George W. Pierce and H. M. Brewer signed it. They therefore, and not Elisha Pierce, made such covenants as are contained in it, and he is not liable in this action by virtue of that written contract.

The difference in the language used in referring to the property that may be afterwards acquired from that used in granting that already owned suggests a grave doubt as to the meaning of the former. In the latter case the applicant grants "all his right and title to any and all property of which he is now seized and possessed, or to which he hath any right or title," to the corporation, while the covenantors simply covenant that they will have that to be acquired, conveyed and transferred to the corporation. That might well mean to be held in trust for the applicant during his life, and not necessarily that he should surrender all his right and title to it. The property

thus referred to is such as he may become owner of "by any devise, legacy, or otherwise"—the two methods particularly specified being by "*devise*" or "*legacy.*" It can scarcely be imagined that anyone would devise or bequeath property to an inmate of that institution, if he knew it must be at once transferred to the corporation and that the intended beneficiary would have no interest in it. If a testator desired such results, he would leave it directly to the corporation—he might then prescribe such terms as the inmate might profit by. Such a construction of this clause might in some instances prevent the corporation itself from ultimately profiting by a bequest. If an inmate could have the benefit for his life a testator might leave money or property to him, which he could leave to the institution. But under the construction contended for these unfortunate people, whose circumstances require them, in order to obtain admission to the institution, to comply with its rules and regulations, would be barred from obtaining relief from their friends, who after their admission became sufficiently prosperous to be willing to help them, for it is idle to say that anyone could be expected to give them property or money, if it must be at once turned over to the appellant, unless it happened to be some one who wanted to help the appellant, and it is not likely he would do so in that round about way.

The next paragraph of this instrument reflects some light on the question. That is, "This done in consideration of such admission, and the applicant hereby constitutes the treasurer thereof, for the time being, at his death, executor of this instrument, which is to operate as a last will, and devises to said institution his entire estate, real and personal, by these presents, of whatever kind and wheresoever situate." It then has quite a lengthy attestation clause. If the "covenant" was intended to have the effect urged by the appellant it is not probable that this "testamentary clause," as we will call it for brevity's sake, would have been inserted. It could do no good unless possibly to pass some naked legal title, for many cases in this State, from *Hamilton* v. *Rogers*, 8 Md. 301, to *Bank* v. *Linderstruth*, 79 Md. 136, recognize the equitable rights that

one may have in after-acquired property. Yet we find that nearly one-half of this part of the contract is taken up with an attempt to make a testamentary disposition of the inmate's entire estate, real and personal. As Elisha Pierce did not even sign it, it is unnecessary to say that this paper could not, under our law, have such an effect, but it reflects upon the meaning of the other clause of which we have been speaking. These and other suggestions that might be made make it at least doubtful whether the contract was intended to mean what the appellant claims.

But without further consideration of those and other minor matters, we are of the opinion that it would be contrary to the public good to lend the aid of the Courts to enforce such a contract as this, if it must be construed according to the appellant's contention. We are not unmindful of the fact that a Court should not lightly strike down a contract on the ground that it is contrary to what is called public policy. That is an uncertain, indefinite term, and when judges come to apply the doctrine they must take care that they do not trespass upon the right to make contracts as parties see proper, so long as they do not violate some principle or policy of law. The learned Chief Judge of this Court said in *Casualty Ins. Co's. Case*, 82 Md., on p. 574. "No exact definition of public policy has ever been given or can be found. Speaking generally, the principle which holds that no one can lawfully do that which has a tendency to be injurious to the public, or against the public good, may be termed the policy of the law, or public policy in relation to the administration of the law," and we would add we do not now propose to attempt to define this subject more accurately. But when dealing with a delicate subject of this character, it gives us confidence in our conclusion when eight Judges, after due deliberation, conclude, as we do, that the public good forbids the use of the process of the Courts of this State to enforce a contract such as this is claimed to be. It is proper that we should say at this point that we have no doubt that the appellant is a most useful institution and is managed by those who would not intentionally

wrong anyone, and there are other equally deserving institutions in the State.   But to give the latitude to this contract that is contended for it might not only result in great wrong to unfortunate people, but establish a precedent that might lead to dangerous consequences.   As we said in the equity case, the contract "is not only not signed by the appellant, but does not profess to impose upon it any obligation for its execution."   In the first part of the contract the applicant and those applying for him not only covenant that he will "at all times yield due submission to the discipline, rules and regulations of the said corporation, of said Home, or its Superintendent," which is perfectly proper to require, but that "should said applicant in the judgment of the Board of Managers thereof fail to do so, *they being the sole and exclusive judges thereof*, or should he be afflicted with ungovernable insanity, we will at once remove said applicant from said institution and release the institution from his support."   If then there happen to be a Board of Managers who thought or determined that an inmate did not at all times yield due submission to such discipline, rules and regulations, they could require his removal, without any appeal from their decision, unless perhaps fraud was proven and that would be difficult, if not impossible, or if the unfortunate should be afflicted with ungovernable insanity he must be removed and the institution released from all obligation to support him.   If an applicant had surrendered all he had when he entered, it would be bad enough to hold by such an uncertain tenure, but when he does that he knows what he is doing.   He knows what he had, what he is giving up, and for what.   That was sustained in *German Aged People's Home* v. *Hammerbacker*, 64 Md. 595, and although we took occasion to speak of such institutions with the praise that they deserve, we said on the question now under consideration, "As to its power, by bond or otherwise, to enforce the conveyance to it of any *future acquisition* of property, it is not necessary for us to express any opinion, as that question does not arise in this case; the whole property now in dispute being owned by Zolles at the time of his ap-

plication for admission.   *We may say that some different prin-ciples might govern the case of future acquisitions."*

Although this question was not then decided, the expression which we have italicized indicated very strongly how the Court then felt about it.   We have shown above the effect that such a provision, if valid, might in our opinion have on the inmates, and on the institution itself, and we would repeat that it could not be expected that the friends of an inmate would give, or leave by will, money or property to him if it must at once become vested in the corporation, and thereby deprive him of its beneficial use—intended to give him comfort and possibly some luxuries of life in his old age.   The effect of that would be to practically deprive all of the inmates of the institution from acquiring any property from the time they enter it, unless it be by mere accident.   But that is not all.   No human being can know, or remotely conjecture how much, if anything, any of them may inherit, or in some unexpected way receive.   It was doubtless far from the thoughts of this old father, the son and every one else acquainted with them that this old man would survive his son and take his entire personal estate.   If it had been thirty-five thousand dollars instead of thirty-five hundred, it would have been the same thing—without any limitation.   Every dollar of it would be diverted from the channels in which it would naturally go to an institution that had undertaken to keep the father for an agreed price, small it is true but agreed upon.   If he had died the day after he entered, it would have had that compensation and took those chances.   It may be that such cases as this are rare, as they doubtless are, but are they not likely to be more so if the relatives of those in such institutions know the consequences of dying intestate, if some corporation and not their relatives must take their estate.

JUDGE MILLER, in speaking of a contract for the sale of a *specified* quantity of goods or a *certain* number of shares of stock to be delivered in the future not being invalidated by the circumstance that at the time of the contract the vendor neither had the goods nor had contracted to buy them, nor

had any reasonable expectation of becoming possessed of them by the time of the delivery, otherwise than by purchasing them after making the contract, said, "The Courts have established this law in the supposed interest of trade and for commercial convenience, notwithstanding the admitted fact that such contracts partake of the nature of gambling transactions." *Wilson* v. *Wilson,* 37 Md. 15. If *such* "contracts partake of the nature of gambling transactions," what is to be said of an obligation which undertakes to bind one to deliver any and all the property whatever which he may, "by any devise, legacy or otherwise become the owner of?" Assignments have been sustained in some cases which were made by heirs of their interests in an ancestor's estate, but it was the interest in a *definite, fixed estate,* and similar agreements have been upheld, the Court of course being satisfied there was no fraud and no overreaching. But we have not been referred to a case which goes to the extent we are asked to go in this. The old common law barriers supposed to have been erected for the good of the public have in the march of progress been completely removed, or greatly reduced, in suits involving assignments of *choses in action,* dealings with after-acquired property and similar matters. Equity has lent her hand to help litigants over some of the places too well fixed at common law to overcome without such aid, but thus far we have not departed from the common law far enough to sustain a suit for an alleged breach of such a contract as this.

It may be that the appellant and other similar institutions can make provisions by which those who receive the benefit of their beneficence can be required to compensate them by some fixed, definite compensation, in case they acquire property after being admitted into the institution. It is manifest that some changes can be advantageously made in the form of the contract, and in doing so they could probably validly so contract as to require each one admitted to agree that, in the event he subsequently receives the means, he will pay, in addition to the amount paid when he enters, a certain sum per annum while he remains there, or so much as such means will

enable him to pay.    As the charter, by-laws, etc. , are not before us we do not speak more definitely, but believing the institution to be a worthy one, we thus suggest what may possibly avoid in the future the loss of what would seem to be only just for it to recover, if it so contracts with those admitted.    In these cases, however, the appellant cannot recover, as we are of the opinion that the contract before us is of such a character as to call upon the Court to deny the right · to do so.    So without further discussion of that or other questions in the case, we will affirm both judgments.

> *Judgment affirmed in each case, the appellant to pay the costs.*

(Decided March 23rd, 1905.)