**STEINHAUSER v. ORDER OF ST. BENEDICT OF NEW JERSEY.**

(Circuit Court of Appeals, Eighth Circuit.   March 4, 1912.)

No. 3,520.

**1. APPEAL AND ERROR (§ 1010\*)—FINDINGS—CONFLICTING EVIDENCE—REVIEW.**

A finding of fact by the Circuit Court, though based on doubtful evidence, will not be set aside on appeal, where it is not entirely without support.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3979–3982; Dec. Dig § 1010.\*]

**2. RELIGIOUS SOCIETIES (§ 18\*)—CANON LAW—ENFORCEMENT.**

The canon law is of no intrinsic authority outside the jurisdiction of its origin, or countries observing that system of law, except as sanctioned by statute or immemorial usage, and does not authorize or render valid a rule of a monastic order in this country which attempts to prohibit its members from acquiring or holding property in their own right.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 124–129; Dec. Dig. § 18.\*]

**8. RELIGIOUS SOCIETIES (§ 18\*)—MONASTIC ORDERS—MEMBERS—PROPERTY—INDIVIDUAL OWNERSHIP.**

An issue of legal ownership of specific personal property as between a member of a monastic religious order and the society must be determined by the law of the land, and not by the canon or church law.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 124–129; Dec. Dig. § 18.\*]

**4. RELIGIOUS SOCIETIES (§ 18\*)—RULES—VOWS OF MEMBERS—EFFECT.**

Where a priest on joining a monastic order by his vows and rule agreed to devote his time and labor thereafter during the remainder of his life to the exclusive benefit of the society, and to convey to it all property that he then owned or might thereafter acquire, in consideration of its agreement to suitably support and care for him in health and sickness while a member of the order, so far as it applied to property subsequently acquired as the result of the member's literary efforts and not turned over to the society, but held by the priest in his own name, was at most an executory contract which, though not violative of constitutional guaranties, nor offensive to public policy, was not enforceable by the society, either at law or in equity.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 124–129; Dec. Dig. § 18.\*]

**5. RELIGIOUS SOCIETIES (§ 18\*)—RULES—CONSTRUCTION.**

Chapter 33 of the rule of St. Benedict provided that no member of the order might presume to give or receive anything without the command of the abbot, nor to have anything whatever as his own, but that everything that was necessary they must look for from the father of the monastery, and that no one should have anything "which the abbot did not give or permit him to have." *Held*, that such provision authorized the monk to have and hold in his own right that which the abbot in fact permitted him to have, so that, where a member of the order was permitted by his abbot to retain as his own property the income from certain literary productions which he had accomplished, but he was never required to account for the same to the order during his lifetime, the legal title and possession to such property vested in him under the rule, and at his death descended to his legal heirs, and not to the order.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 124–129; Dec. Dig. § 18.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the Circuit Court of the United States for the District of Minnesota.

Suit by the Order of St. Benedict of New Jersey, a corporation, against Albert Steinhauser, individually and as administrator of the goods, chattels, and credits of Augustin Wirth, deceased. Judgment for complainant (179 Fed. 137), and defendant appeals. Reversed and remanded, with directions to dismiss the bill, and to grant the prayer of defendant's cross-bill.

William H. Pitzer and William Hayward, for appellant.

Otto Kueffner (Albert Schaller and Arnold & Greene, on the brief), for appellee.

Before ADAMS and SMITH, Circuit Judges, and REED, District Judge.

REED, District Judge. The "Order of St. Benedict," an association of religious men living in monastic life and incorporated under the laws of New Jersey, which will be called the complainant, brought this suit in the Circuit Court against Albert Steinhauser, as administrator of the goods and chattels of Augustin Wirth, deceased, a member of the Benedictine order of monks, and alleged to be a member of the complainant order, to establish an equitable title to certain personal property under an alleged agreement made by the deceased in his lifetime, whereby he agreed to account for and pay over to the complainant all of his future earnings, and transfer to it all property of every kind that he might thereafter acquire (of which the property in controversy is a part) in consideration of the care and maintenance that the order agreed to render, and which it is alleged it did render the deceased during his lifetime.

The defendant answered, admitting that he was the administrator of Wirth's estate, but denied the contract or agreement alleged to have been made by Wirth, its validity if made, and pleaded the statute of limitations of Minnesota, and some other defenses in bar of this suit; and by cross-bill alleged that complainant, after the death of Wirth, wrongfully took possession of certain securities, the property of Wirth and in his possession and under his control at the time of his death, removed the same from the state of Minnesota where Wirth then resided, and converted the same to its own use, and prayed that his right and title to said property be established and complainant required to return the same or account to him, as administrator of Wirth's estate for its value. Upon the final hearing the Circuit Court granted the prayer of the bill, and dismissed the cross-bill. 179 Fed. 137. The defendant appeals.

The agreement relied upon by complainant as having been made by Wirth consists of certain vows alleged to have been taken by him upon joining a Benedictine order of monks at St. Vincent's Mission in Pennsylvania, and what is known in the Roman Catholic Church as the "Rule of St. Benedict" and its own charter, and the constitution of its society founded upon that rule. The "rule" it is claimed was originally devised by St. Benedict of Nursia, in the latter part of

the fifth or early in the sixth century A. D., at Subiaco, or Monte Casino, Italy, for the guidance and government of an association of religious men then living in monastic life near Subiaco, who selected him as the head or superior of an order, which still bears his name, the "Order of St. Benedict." Of this association or order there is no evidence in the record, save such as may be gathered from the history thereof; and it is probable that none is now obtainable from any other source. For summaries of the history of the order and of monachism generally, its rise and spread over Western Europe, its decline in the Reformation era and later, its suppression by many of the European states in the Middle Ages and later, and its present status in Europe and the United States, see 2 Catholic Encyclopedia (Robert Appleton, New York, 1907) articles "Benedict" and "Benedictine"; 3 Encyclopedia Britannica (9th Ed.) article "St. Benedict"; and vol. 16 "Monachism," where synopses of the 73 chapters of the "Rule of St. Benedict" are given; and a Short History of Monks and Monasteries, by Wishart (1900). Aside from the history of the order, the ultimate facts shown by the testimony, so far as necessary to be considered, are substantially as follows:

Augustin Wirth, a Bavarian by birth, came to this country prior to 1852, when about 23 years of age. In that year he was ordained a Roman Catholic priest, and joined and became a member of a Benedictine society, or order of monks established about 1846, at St. Vincent's Mission, Westmoreland county, Pennsylvania, by Boniface Wimmer and others. The society was later incorporated under the laws of Pennsylvania. Its charter and the constitution of the society are substantially the same as those of the complainant hereinafter set forth. At the time Rev. Wirth joined the St. Vincent Society he made and delivered to it vows in writing which read as follows:

"In the Name of Our Lord Jesus Christ, Amen!

"I, Brother Augustin Wirth, a Bavarian of the diocese of Wuerzburg, to the honor of Almighty God, of the ever Blessed Virgin Mary, and our holy Father St. Benedict, and of all the Saints, by these present vows, promise stability and the conversion of my morals, and obedience according to the Rule of the same Holy Father St. Benedict, in the presence of God and His Saints, whose relics are here present in the church, and also in the presence of the Right Reverend Father in Christ and Lord Boniface, the Superior of this Monastery of St. Vincent's, and of you Rev. Fathers and Brothers here present; in the name of the Father, and of the Son and of the Holy Ghost, Amen.

"In Witness Whereof I have written with my own hand this present paper in this venerable place of St. Vincent, in the year one thousand eight hundred and fifty-two from the Incarnation of our Lord, on the feast of the Assumption of the Bl. Virgin Mary, the fifteenth day of August.     (Sign of the Cross.)"

Wirth remained a member of the St. Vincent Society until 1865, when he went to Atchison, Kan., as prior of the monastery of the Benedictine order at that place, and remained with that institution for some years. In May, 1887, he transferred his membership in the order of St. Vincent to, and became a member of, the complainant order, which was originally established at Newark, N. J., prior to

1868, and was incorporated in that year by a special act of the Legislature of New Jersey, which act is as follows:

"An act to incorporate the Order of St. Benedict, in New Jersey.

"Section 1. Be it enacted by the Senate and General Assembly of the state of New Jersey, that Boniface Wimmer (and others, naming them) and their associates, members of the society called the Order of St. Benedict, being a society of religious men living in community and devoted to charitable works and the education of youth, be, and they are hereby, constituted a body politic and corporate by the name, style and title of the 'Order of St. Benedict' of New Jersey, to have perpetual succession, to use a common seal, and alter and renew the same at pleasure, to take hold and enjoy lands, tenements and hereditaments, and to make such by-laws for their government and for the admission of members into the corporation as they shall deem necessary and proper; provided, that such by-laws shall not be repugnant to, nor inconsistent with the Constitution of the United States or of this state; * * * and provided, that no person shall be or remain a corporator except regular members of said religious society, living in community and governed by the laws thereof.

"Sec. 2. That the essential objects of said corporation shall be the education of youth and the establishment of churches and conducting service therein. * * *.

"Approved March 5, 1868."

The constitution of the society, so far as necessary to be stated provides:

"Sec. 2. The object of this corporation is divided between the educational training of youth and the spiritual guidance of souls. Each is conducted in conformity with the principles and the general discipline of the Roman Catholic Church and in accordance with the disciplinary statutes of the Order of St. Benedict, well known throughout the Roman Catholic Church.

"Sec. 3. The officers of the corporation shall consist of a president, first vice-president, second vice-president, treasurer and secretary. The Rt. Rev. Abbot of St. Mary's Abbey, 528 High St., Newark, New Jersey, * * * shall be ex officio president. * * * The president is also acting treasurer. * * *

"Sec. 4. The president * * * shall have full power to make, execute, sign, seal and deliver all * * * writings whatsoever, necessary to the proper conduction, carrying on and transacting the temporalities of the order. * * *

"Sec. 10. To become and to be a member of this Corporation it is absolutely necessary:

"(1) To become a member of the Order of Saint Benedict founded about the year A. D. 525 by St. Benedict in Italy, and well known in the Roman Catholic Church.

"(2) To have made solemn vows in the said order and to have received the order of priesthood in the Roman Catholic Church.

"Section 11. Membership is lost at once:

"(1) By being dismissed according to the disciplinary statutes of the Order of St. Benedict of New Jersey, approved of by Pope Pius IX for the American Cassines Congregation of Benedictines.

"(2) By voluntarily leaving the order for any purpose whatsoever.

"(3) By joining any other order or secret society or any other religious denominations.

"Sec. 12. Since the Order of St. Benedict of New Jersey is solely a charitable institution, the real estate of said order and the individual earnings of its members, are and must be considered as common property of the Order of St. Benedict of New Jersey from which the members of said order derive their support and the balance of which income and property should serve for following up and carrying out the charitable objects of the order.

"It is therefore agreed upon by all the members of the said Order of St. Benedict of New Jersey that no member can or will claim at any time or un-

der any circumstances more than their decent support for the time for which they are members of the charter of the Order of St. Benedict of New Jersey, and no further.

"And, moreover, that each member individually pledges himself to have all property, which he now holds or hereafter may hold, in his own name conveyed as soon as possible, to the legal title of the Order of St. Benedict of New Jersey. * * *"

An English translation of what purports to be chapter 33 of the rule of St. Benedict, which is observed as such by the St. Vincent and complainant societies, was put in evidence by complainant and is as follows:

"The vice of personal ownership must above all things be cut off in the monastery by the very root, so that no one may presume to give or receive anything without the command of the abbot; nor to have anything whatever as his own, neither a book, nor a writing tablet, nor a pen, nor anything else whatsoever; since monks are allowed to have neither their bodies nor their will in their own power. Everything that is necessary, however, they must look for from the father of the monastery; and let it not be allowed for any one to have anything which the abbot did not give or permit him to have. Let all things be common to all, as it is written. And let no one call or take to himself anything as his own. But if any one should be found to indulge this most baneful vice, and having been admonished once and again, doth not amend, let him be subjected to punishment."

In about 1897, Wirth, with permission of complainant's abbot, became priest of a German Catholic church society at Springfield, Minn., and went there and remained in charge of that parish as priest until his death, December 22, 1901. He left a brother and a nephew and niece surviving him as his heirs at law; but left no debts, other than those of his last sickness. At the time of his death he had in his possession and under his control some $1,500 in money, and notes, mortgages, and other credits to the amount of some $5,000 or more, the legal title to all of which he then held. This property was acquired by Wirth in this way: While a member of the Society of St. Vincent he wrote a number of books upon religious subjects and translated others, which he copyrighted in his own name, and published and sold, the income from which he received and retained as his own property with the permission of the abbot of St. Vincent. When he came to the complainant order in 1887, the abbot of that order, the Rt. Rev. Hilary Pfraengle, gave him permission to continue such literary work, receive the income therefrom, and retain the same in his own right as he had previously been allowed to do at St. Vincent; and the money and other property that he had on hand at the time of his death are the proceeds arising from the sale of such books and the investment thereof in the mortgages and securities before mentioned, none of which property had ever been transferred to the complainant or to any other Benedictine order. After Father Wirth joined the complainant society in 1887, the relations between him and its abbot were not pleasant or satisfactory to either, and Wirth at times was desirous of leaving the monastery. They had many acrimonious disputes over matters pertaining to the order; but none regarding the money received by Wirth as the income from his books, all of which was received by him with the knowledge of, and without objection from, either abbot. While Father Wirth was in New Jersey he served for several years as parish

priest of religious congregations in the vicinity of complainant's monastery, with permission of its abbott, and also at other places. He also remained away from the monastery much of the time without the abbot's permission, at one time going abroad and visiting Rome, at his own expense; and whenever absent from the monastery he received no support from complainant. After going to Springfield he never returned to the complainant order, never received any support from it, and never accounted to it for the income from his books, and was never requested to do so until in June, 1899, when Hildebrand, abbot primate, resident in Rome, of the Benedictine orders who met Wirth when he was in Rome, directed him by letter to write Abbot Pfraengle and apologize to him for his conduct, account to him for any moneys that he had not accounted for, and to obey his orders in the future. Hildebrand also wrote Abbot Pfraengle in February preceding to impose upon Wirth suitable penance, and require of him obedience in the future, and to account to him, Pfraengle, for all moneys that he had not accounted for. Wirth disregarded Hildebrand's letter, and so did Abbot Pfraengle the one to him. The latter testified that he did so because Hildebrand did not know of the permission that the abbot of St. Vincent, and he as complainant's abbot, had given Wirth to receive and retain the income from his books. Abbot Pfraengle also testified, however, that the permission given by him and by the abbot of St. Vincent to Wirth to have and use the income from his books was that he might use the same for the benefit of the orders only. Suffice it to say that the property involved in this suit is the income received by Father Wirth from his books, the investment thereof in the securities mentioned or other property, the right to the copyright of his publications after the expiration of his contract with the publishers thereof, and the credits due him for books sold prior and subsequent to his death, none of which was ever conveyed or transferred by him to complainant, and all of which was taken possession of by complainant's abbot after the death of Father Wirth without any legal proceedings authorizing him to do so; and complainant bases its right to the same upon the vows made by Wirth when he joined the Order of St. Benedict (chapter 33 of the rule of St. Benedict), and the transfer by Wirth of his membership to the complainant order, and the charter and constitution of its society.

It is admitted by the defendant in argument that Rev. Wirth became a member of the complainant order in 1887; but whether or not he withdrew from that order and severed his connection with it is a matter of much doubt under the testimony. Certain it is that he never returned to, nor in any way affiliated with, the complainant order or received any support from it, after he went to Springfield, unless the salary earned by him as priest of the German Catholic society at that place, and from which he supported himself, be deemed the property of the complainant.

[1] The decree of the Circuit Court, however, includes the finding as a fact that Wirth did not withdraw from the complainant order, but remained a member thereof until his death; and that finding is not so without support in the testimony as to warrant setting it aside.

The case will, therefore, be determined on the assumption that Wirth remained a member of the complainant order until his death. Witnesses in behalf of complainant, its abbot and the abbot of St. John's Abbey, a Benedictine order at Collegeville, Minn., testified upon the hearing that the vow of poverty, which they say is included in the vows of Father Wirth, when made in a religious order, would, under the canon law, "incapacitate the member from ever after acquiring or possessing property for himself, and from making individual use of temporal things that can be valued in money"; and some contention is made in argument of counsel for appellee that this vow in connection with chapter 33 of the "rule of St. Benedict" should be so construed and enforced accordingly.

[2] It is necessary to read into the vows of Father Wirth the "vow of poverty" so much relied upon by complainant, for it is not expressed in the vows as written by him. But admitting, without deciding, that such testimony is competent to show the meaning and effect of the vows, in connection with the rule of St. Benedict upon the right of Wirth to thereafter acquire and hold property in his own right under the canon law; that law is of no intrinsic authority outside the jurisdiction of its origin, or countries observing that system of law, except as it is sanctioned by statute or immemorial usage. 1 Bl. Com. 82-84. There is no question of church doctrine, or of religious belief, or discipline involved in this controversy; nor is it a dispute between contending factions of a church or other society as to which faction has conformed its practices and beliefs to the standards of the church, or society, and by reason thereof claims the right to the control and use of its property, in which event the decisions of the tribunal created by the church or society for the determination of such questions would be accepted by the civil courts as final. Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666.

[3] The only question involved is that of the legal ownership of the specific property described in the bill, as between the complainant and the defendant, and that question is not to be determined by the canon, or church law, but by the law of the land. The canon law, however, or the law of the church, of Rome, as between Father Wirth and the church or the Benedictine order, may have required of him during his lifetime strict adherence to his vows and observance of the rule; but it cannot be seriously contended that either the vows or the rule or both together can have any effect whatever upon the legal right of Wirth to acquire and hold property in his own right.

[4] The most that can rightly be claimed for these vows in connection with the rule is that they are evidence of a contract of a civil nature between Wirth and the order, whereby he agreed to devote his time and labor thereafter during the remainder of his life to the exclusive benefit of the society or order, and to convey to it all property that he then owned or might thereafter acquire, in consideration of the agreement upon the part of the order to suitably support and care for him in health and in sickness while a member of the order; and complainant predicates its right of action against the defendant upon such a contract so made. That the vows of

Wirth and that portion of the rule in evidence are in effect a contract as between him and the order is not seriously disputed by the defendant; but its validity is challenged by him as being inconsistent with the "fundamental principles of American institutions as expressed in their constitutions"; or, if it is held valid, then he contends that its true interpretation does not entitle the complainant to have the same enforced against the property in controversy.

Contracts of a similar nature where the service has been rendered, the property conveyed, and the support furnished pursuant thereto have been adjudged by controlling authority to be not in violation of constitutional guaranties nor offensive to the public policy of the state where made. Goesele et al. v. Bimeler, 14 How. 589, 14 L. Ed. 554; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718; Schwartz v. Duss, 187 U. S. 8, 23 Sup. Ct. 4, 47 L. Ed. 53; Burt v. Oneida Community, 137 N. Y. 346, 33 N. E. 307, 19 L. R. A. 297, and the several cases cited therein. These suits were brought by members of the Separatists and Harmony Societies established in Ohio and Pennsylvania early in the last century, and the Oneida Community in New York established in 1848, by members thereof, respectively, after they had withdrawn from the society, or by the heirs of a member after his death, for partition of the property of the society, or to recover the value of property conveyed or services rendered to it before the withdrawal or death of the member, except that in the Oneida Case the suit was by one who had withdrawn from the society to be reinstated therein. The contracts there involved had been fully performed by each of the parties, and it was held in each case that there could be no recovery. And see State v. Amana Society, 132 Iowa, 304–313, 318, 109 N. W. 894, 8 L. R. A. (N. S.) 909, 11 Ann. Cas. 231. The facts in each case are so materially different from those in this case that the decisions have little or no bearing upon the questions here involved. This suit involves only the property acquired by Father Wirth after he joined the society, the legal title and possession of which he retained until his death.

Although it is admitted in the brief of counsel for appellee that a member of the order may voluntarily withdraw therefrom, as provided in section 11 of the constitution of the complainant society, yet it was vigorously maintained by complainant's abbot while a witness that this meant by "secularization" only, and by that we understand him to mean some affirmative action on the part of the church. The abbot says:

"He (the member) is bound for life by his vows, and the only way to get out is by secularization, being secularized by transferring the vow of obedience to a bishop and being dispensed by living with permission outside of the monastery. * * * It is when a religious, a priest, by permission of the Pope, the Holy Father, the head of the church, is dispensed from his vows and also dispensed from his obligation of living in the monastery."

By this Rev. Abbot obviously means that under the law of the church the vows of a member of the order are regarded as such that they can only be absolved therefrom by the affirmative action of the Holy Father as the head of the church; and unless he sees fit to give the requisite dispensation, the member is bound for life in tem-

poral, as well as in spiritual, affairs. If such is the meaning of the vow, is it, in connection with chapter 33 of the rule, enforceable in the civil courts, either at law or in equity? We think not. Chapter 33 provides:

"The vice of personal ownership must above all things be cut off in the monastery by the very root; so that no one may presume to give or receive anything without command of the abbot; *since monks are allowed to have neither their bodies nor their will* in their own power; everything that is necessary, however, they must look for from the father of the monastery; and let it not be allowed for any one to have anything which the abbot does not give or permit him to have. ⁂ ⁂ ⁂ "

The vow in connection with this rule, not only binds the member in physical and mental servitude to the order for life, or until the head of the church shall see fit to absolve him from his obligations, but he also surrenders all control of his will to the order. Such an agreement is no more enforceable, in the civil courts at least, than would be an agreement by one to surrender or forfeit to another his life. See Clark's Case, 1 Blackf. (Ind.) 122, 12 Am. Dec. 213, and note. In this country it is the inherent and natural right of every person to acquire and hold property in his own right; and the state is interested in preserving the liberties as well as the lives of its members, and they are guaranteed against the deprivation thereof, either by the state or by any person, individual or corporate, without due process of law. If the agreement to perform the services is not enforceable, then upon what principle can it be enforced as an equitable title or right to the fruits of such services? We are of opinion that there is none. Complainant has cited to us no authority which sustains its contention, and upon a somewhat diligent search we have not been able to find any that does. Authorities are not wanting, however, if the vow and rule together are treated as a contract and to mean what is claimed for it by complainant, that it is not enforceable as against after-acquired property, either at law or in equity.

In Baltimore Humane Society v. Pierce, 100 Md. 520, 60 Atl. 277, 70 L. R. A. 485, Elisha Pierce had been admitted as an inmate of the Aged Men's Home of the Baltimore Humane Society, and while there his son died intestate leaving property which under the law of Maryland descended to his father, the inmate of the home. The suit was brought upon a contract made by the defendants upon the admission of Elisha to the home to recover the value of this inherited property, which contract was in substance as follows:

"We hereby covenant and declare that Elisha Pierce about to be admitted into the Aged Men's Home of the complainant corporation hath not now any property, and is not the recipient of any income from any source whatever; and so also covenant that should he, by any devise, legacy or otherwise, become the owner of any property whatever, we will have the same, with any now owned, conveyed and transferred to said corporation, in obedience to this covenant."

This contract was adjudged by the unanimous opinion of the Court of Appeals of Maryland to be not enforceable as to the property in-

herited by the inmate from his son, upon the ground as stated in the syllabus (60 Atl. 277) that:

"A contract executed on entrance into an old men's home, whereby any property which the inmate may receive in the future is to become the property of the home, is unenforceable, as against public policy."

Aspinwall Manf'g Co. v. Gill (C. C.) 32 Fed. 697, was a suit to restrain the alleged infringement of a patented machine, and the question arose whether or not an agreement to assign future improvements that the patentee might obtain upon his invention was valid. Mr. Justice Bradley, at circuit, in speaking of the validity of such agreement, said:

"That such assignments of future improvements upon a machine, in connection with the assignment of a patent for such machine, are valid, is settled, I think, by the case of Littlefield v. Perry, 21 Wall. 226 [22 L. Ed. 577]. But a naked assignment, or agreement to assign in gross, a man's future labors as an author or inventor—in other words, a mortgage on a man's brain, to bind all of its future products—does not address itself favorably to our consideration. It is something like engagements of an expectant heir, binding the property which he may afterwards inherit, which are always looked upon with disfavor by the law."

Hershy v. Clark, 35 Ark. 17, 37 Am. Rep. 1, involved the question of the validity of a contract between two brothers neither of whom was married, who by their joint industry had acquired a large property real and personal which they held in common. They entered into an agreement whereby it was agreed that upon the death of one the survivor should hold all the interest of both in the property to the exclusion of all other persons. Upon the death intestate of one of the brothers his heirs claimed his share of the property as against the heirs of the other, who died intestate some time after the death of the first. Of this contract the court said:

"It professes to convey nothing in presenti, and cannot stand as a conveyance; nor can it be upheld as a mutual covenant. It is unreasonable and against public policy that one should be allowed, by an irrevocable contract, not only to denude himself of all control of all his property, of every nature whatever, which he at the time possesses, but also of all he may afterward acquire. Such a contract would not be enforced either in law or equity. It is obvious, too, that the brothers did not intend their obligations to have that force during their lives. * * * It was revocable at pleasure by either."

Benziger et al. v. Steinhauser (C. C.) 154 Fed. 151, cited by complainant, arose out of the same transaction involved in this suit. A demurrer to the bill was interposed, and all that is held is that the facts alleged state a cause of action, without deciding what the decision might be upon the evidence.

It is said in support of the decree under review that:

"So far as the performance of the contract is concerned, this suit presents the case of an executed contract and not the case of an executory contract. * * * The claim of the defendant upon the facts is, in effect, a claim that had Wirth before his death paid over to the order what he received for the sale of his books, or for his personal services, his administrator or his heirs could nevertheless after his death have maintained an action to recover back the amount so paid and the value of his services."

This, we think, is a clear misconception of the purpose of this suit, and of the status of this controversy. If the alleged contract

between the complainant and Father Wirth had been fully executed, by the rendition of the services, or the conveyance of the property in controversy, to the complainant, there would, of course, have been no occasion for it to resort to a court of equity for the specific performance of the contract, or to establish an equitable right to the property, which the Circuit Court held the suit in effect to be, but it could have rested upon its legal title to, and possession of, the property. The fact that complainant was driven to this suit is of itself sufficient to show that the alleged contract was not in fact an executed one. The distinction between an executory contract and one fully executed is nowhere more clearly or tersely stated than by Chancellor Kent, in volume 2 of his Commentaries (page 450), where he says:

"An executory contract is an agreement * * * to do or not to do a particular thing. * * * The agreement conveys an interest either in possession or in action. If for instance one person sells and delivers goods to another for a price paid. the agreement is executed and becomes complete and absolute; but. if the vendor agrees to sell and deliver at a future time and for a stipulated price, * * * the contract is executory and rests in action merely."

That the alleged contract was not executed as to the property in controversy we think admits of no doubt. The fact that complainant took possession of this property, and the other effects of Rev. Wirth, after his death and removed them to New Jersey, does not in the least strengthen its claim thereto, and the legal right to the property must be determined as if complainant had not thus acquired its possession, and the administrator had secured it upon his appointment and qualification. We have no doubt that as to the property in controversy the alleged contract on the part of Father Wirth was executory only.

It may be that, if Wirth in his lifetime had conveyed this property to the complainant, he could not thereafter have recovered it back, and that his legal representatives could not after his death; but of this we need express no opinion, for the question is not involved.

[5] We are of opinion, also, that the complainant is not entitled to recover for another reason. It is obvious that chapter 33 of the rule, considered as a contract, does not forbid absolutely a member of the order from owning and holding property in his own right. The rule provides:

"And let it be not allowed for any one to have anything which the abbot did not give, or permit him to have."

This plainly authorizes the monk to have and hold in his own right that which the abbot, who is the superior officer of the order, may permit him to have. The rule is by reference made a part of the complainant's charter, and whatever the rule permits the charter authorizes. The complainant cannot accept so much of the rule as may be to its benefit, and reject that which may work to the advantage of the member.

It appears with reasonable certainty that at the time Father Wirth joined the complainant society he owned in his own right, and had

in his possession, some at least of the income from his books that the abbot of St. Vincent had permitted him to have as his own. Just how much does not appear. Complainant's abbot knew this, and he testified that the taking of the vows required of a member upon joining the order was always accompanied by a transfer to the order of all property he then owned; yet he did not require of Father Wirth that he transfer to the society that property. The abbot also testified repeatedly that he gave Wirth permission at the time he joined the complainant order to have and retain the income from his books as he was allowed to do at St. Vincent, and that he never required him to account therefor, even at the request of Hildebrand, the abbot primate in Rome, that he do so. He also testified that this literary work of Wirth's from which he derived this income was beyond what he was required to do for the order. The conclusion is unavoidable that Wirth was permitted by the abbot of St. Vincent, and the complainant's abbot, to retain as his own property the income from his books. It is true that later in his testimony the abbot testified that the permission given by him, and the abbot of St. Vincent, was that he might devote the income from his books to the charitable purposes of the orders. He was not present when the abbot of St. Vincent gave his permission, which was many years before Wirth came to the complainant; and he failed to explain how he knew that abbot attached any such condition to his permission, nor does he explain how Rev. Wirth while in Minnesota could have expended the income from his books for the charitable purposes of the order in New Jersey. Again, it would have been a useless thing to have given Wirth permission to have expended this income for the benefit of the complainant; and such a permission is wholly inconsistent with the conduct of the abbot in reference to such income, for he knew that Wirth was receiving and using it for his own benefit, and, if he understood that such income was to be expended for the benefit of the order, he certainly would have required of Father Wirth that he account for the expenditures, especially when requested by the abbot primate to do so. This he never did, for the reason, as he says, that Father Wirth had permission to use the same. We are satisfied beyond any doubt that Wirth had permission of both abbots to receive the income from his books and retain it as his own property, and that the rule upon which the complainant relies, and which is a part of its charter, permits this. The legal title to and possession of the property in controversy was in Wirth at the time of his death, and under the statutes of Minnesota would descend to his legal heirs. The complainant by this suit seeks to divert it from that channel by showing that it was the equitable owner thereof, and that it was held by Wirth only in trust for it. The burden is upon it to establish that fact by clear and satisfactory evidence. It has failed to do so, and is not, therefore, entitled to a decree adjudging it to be the owner of the property.

This renders it unnecessary to consider the defense of the statute of limitations, or that the probate court of Minnesota has exclusive jurisdiction of this controversy, and some other defenses urged by the defendant. The decree of the Circuit Court is reversed, and the

cause remanded to that court with directions to dismiss the complainant's bill at its costs; and to grant the prayer of the defendant's cross-bill.

It is so ordered.