Harriet Schuman became an inmate of the Bloomfield Home for Aged Men and Women at the age of seventy-nine and remained four years, until her death. She signed the usual form of application for admission, by which the home agreed to maintain her for life, "or so long as said home shall be supported by said voluntary contributions in the manner warranted by its income," and in which she agreed, in consideration of being received as an inmate, to pay an entrance fee of $300, and "to assign and set over in proper legal manner any pension or other property, real or personal, of which I may be seized or possessed or may hereafter acquire." She died possessed of an estate valued at $30,000, which, oddly, came to her shortly before her death. Sixteen days before she passed away her son-in-law, Charles P. Zabriskie, died testate, leaving his estate to his widow, who died testate a few days later, leaving it to her mother. Mrs. Schuman's next of kin are nieces. The complainant, Fidelity Union Trust Company, holds the fund and asks instructions to whom to pay it. The next of kin claim that the contract to assign does not include the mere possibility of a legacy, and that a contract to assign all future acquired property is contrary to public policy.
The great weight of authority in England and this country is that a mere expectancy or possibility by inheritance or testament is not assignable at law, but is assignable in equity for a valuable consideration, and that the assignment will be enforced in equity when the expectancy or possibility has changed into a vested interest or possession. 3 Pom. Eq. §§ 1271, 1287;Warmstrey v. Tanfield, 1 Ch. (Eng.) 29; *Page 492 Bennett v. Cooper, 9 Beav. 252; Wilson Estate, 2 Pa. St. 325;Smithurst v. Edmunds, 14 N.J. Eq. 408; Bacon v. Bonham,33 N.J. Eq. 614; Mitchell v. Winslow, 2 Story 630; Holroyd v.Marshall (Eng.), 10 H.L.C. 191.
The general principle is not controverted, but it is contended that to be good in equity the subject-matter of an assignment of an expectancy or possibility must be in contemplation of the parties. In other words, that the source of the possible inheritance or bequest must be apparent. In support of the proposition, cases at law are cited where specified prospects, including all future acquisitions, were assigned, and where it was held that the assignments were inoperative as to the latter, because it was found not to have been the intention of the parties that property later accidentally acquired should thereby pass; the logic being that it would include future earned income, and one does not intentionally deprive oneself of the means of livelihood, and that the impolicy of permitting one to do so reflects the absence of such intention. Tadman v. D'Epinenil,20 L.R. Ch. Div. 758; Cook v. Conway, 2 Cranch C.C. 99;Munsell v. Lewis, 4 Hill 635; reversed, 2 Den. 224; overruled,Field v. Mayor of New York, 6 N.Y. 179. These cases do not hold that an assignment of a possibility, unless a definite source be contemplated, is operative and non-enforcible in equity. In Field v. Mayor of New York, supra, the court of appeals said: "Whatever doubt may have existed heretofore on the subject, the better opinion, I think, now is that courts of equity will support assignments, not only of choses in action, but of contingent interests and expectations, and things which have no present actual existence, but rest in possibility only, provided the agreements are fairly entered into, and it would not be against public policy to uphold them. Authorities may be found which seem to incline the other way, but which, upon examination, will be found to have been overruled or to have turned upon the question of public policy." In the case in hand there were possibilities but no prospects, and in the very nature of things all possibilities, whatever the source or origin, were comprehended. *Page 493 
The contract was fairly entered into and faithfully and honestly carried out by the home, and ought in conscience to be upheld, and may be upon the principle and authority above stated, unless it is in conflict with the policy of the law.
The principles and doctrine of public policy are matters of common professional knowledge. While the term is profound, as well as panacean in legal jurisprudence, it admits of no exact definition. Its virtue and vigor lies in its flexibility of application, and while reported cases furnish guides, they rarely are compelling in precedent. I am referred to Baltimore HumaneSociety v. Pierce, 100 Md. 520; 60 Atl. Rep. 277;70 L.R.A. 485, in which the court refused to enforce a somewhat similar contract on the ground that it offended public policy. There Pierce, the father, made a written application to the society for admission to its home, in which he promised to obey the house rules. The society reserved to itself the right to expel him for cause. Pierce, the son, and another, covenanted with the society, that if Pierce, the applicant, should acquire any property by legacy, devise or otherwise, they would cause the same to be transferred and conveyed to the society. The son died and the father inherited from him $3,500. The father refused to transfer, and the society brought suit for damages for breach of the covenant. The court felt that it would be contrary to the public good to lend the aid of the courts to enforce such a contract, and the reason seems to be: The inmate's term was precarious, because of the society's reserved right to expel him; he was hopeless of relief from friends, because they would not give if he was not to enjoy. He would be deprived of the beneficial use intended to give him comfort and possibly some luxuries of life in his old days. The society itself might suffer because of this reluctance of friends to give to inmates. And because of the uncertainty of the value of property that might come to the inmate and pass to the society, and thus be diverted from its natural channels. The action was at law, where, as we have seen, assignments of possibilities are not recognized, and the court was not unmindful of the different view entertained in *Page 494 
equity and made pertinent allusion to it. The inconveniences in the case were persuasive. It seems to me, however, that the public welfare is better served by upholding contracts of this kind whereby institutions, which care for the aged and tend to relieve the public of their charge, are facilitated in their work for the poor, than to put the ban of the law on them because, perchance, some one of the unfortunates might quite accidentally be favored by the death of a rich relative or friend. And to them the sureness of a home in their declining years far outweighs the advent of any such remote possibility.
The opinion is uninfluential in this case because of the marked difference in circumstances. Mrs. Schuman's welfare is not at stake. What would be the equitable course had she survived and renounced her contract, and whether the doctrine of public policy would be applied, are interesting questions not presently involved. This dispute over her estate is between the home she intended should have it and her collateral kin who claim under the statute, and the judicial inclination and temper is not as keen, and justly so, to apply the doctrine of public policy.
Mrs. Schuman's contract with the home was manifestly not improvident, and the home having secured her against the poorhouse, against becoming a public charge, and the public interest being thereby protected and conserved, I fail to see any invasion of the policy of the law or any ground on that score justifying its invalidation. That the lifetime maintenance of Mrs. Schuman by the home was contingent upon its being supported by public contribution does not militate against this view. The home's utmost capacity was pledged. The contingency was intrinsic and inherent in the contract, as in all contracts. The home has performed its part of the contract in full. It maintained Mrs. Schuman four years in happy surroundings, and would, no doubt, have continued to do so had she lived many more years. For this it received initially a mere pittance, and the promise of the possibility, and was content. Vulgarly speaking, the home and the inmate each took a chance, and in this instance *Page 495 
the home won. But suggestion of the spirit of gamble is unfair and offends good taste, for the home is a pure charity for the aged homeless, supported by public contributions, and unselfishly served by kindly and generous men and women. Mrs. Schuman had a fondness for the home before she sought its shelter, and gladly contributed what little she had and offered more and all, if more should come to her by any possibility, to help other unfortunate of this noble institution. The defense of public policy, in the circumstances, is an intrusion. The policy that dictates that no man shall pauperize himself and become a charge on the public also conversely teaches that charitable institutions which tend to save the public of such charges are to be encouraged.
Just a comment: It seems strange that if the doctrine of public policy is as potent in a case of this kind, as claimed by the next of kin, it was not extended to the many cases in this state where gifts by aged persons to confidants, of all they possessed, were set aside on the ground of improvidence solely because there was no independent advice. Slack v. Rees, 66 N.J. Eq. 447;Post v. Hagan, 71 N.J. Eq. 234; Reeves v. White, 84 N.J. Eq. 661;Voorhees v. Christie, 95 N.J. Eq. 360. In those cases the danger of becoming a public charge was far more imminent than here, where only an intangible possibility is involved, and yet the doctrine was not even adverted to.
It is further contended that the contract ought not be specifically enforced because it was not mutual, in that the home agreed to maintain the applicant for life if it was supported so long by voluntary contributions. Both parties were bounds to its terms and the home has performed.
The contract was in fact made with the Bloomfield Home. As reduced to writing, it appears to have been made with the Job Haines Home. This was a mutual mistake, accidentally made and easily explained. The lady managers of the Bloomfield Home are also managers of the Job Haines Home, a related organization. Though the homes are separate corporate entities, the lady manager having charge of *Page 496 
applications served both institutions. The Bloomfield Home had no blank forms of applications, so one of the Job Haines Home was used. They forgot, or accidentaly omitted, to strike out the name "Job Haines Home" and substitute "Bloomfield Home." The court will do that for them when the pleadings are properly moulded. It is claimed in this respect that a contract required by the statute of frauds to be in writing cannot be reformed and enforced. Wirtz v. Guthrie, 81 N.J. Eq. 281; 87 Atl. Rep. 134:Vogt v. Mullin, 82 N.J. Eq. 452; Davimos v. Green, 83 N.J. Eq. 596;92 Atl. Rep. 96. The contract is not within the statute of frauds. It might have been performed within a year. Eiseman
v. Schneider, 60 N.J. Law 291.
Another point is that the acceptance of the fund by the home isultra vires the home, because the authority to do so is not embodied in its charter. If that be so, advantage can be taken only by the attorney-general. DeCamp v. Dobbins, 29 N.J. Eq. 36;Stockton v. Central Railroad Co. of N.J., 50 N.J. Eq. 52;Willoughby v. Chicago Junction Railway, 50 N.J. Eq. 656. The complainant will be directed to pay the fund to the Bloomfield Home.